796 So.2d 649 (2001)
STATE of Louisiana
v.
Jarrell NEAL.
No. 2000-KA-0674.
Supreme Court of Louisiana.
June 29, 2001.
Opinion Granting Rehearing in Part September 21, 2001.
*651 G. Benjamin Cohen, Clive Adrian Stafford Smith, R. Neal Walker, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Jr., District Attorney, Walter G. Amstutz, Harvey, Thomas S. Block, New Orleans, Terry M. Boudreaux, Gretna, for Respondent.
VICTORY, J.[*]
On May 21, 1998, a Jefferson Parish grand jury indicted the defendant, Jarrell *652 Neal, his older half-brother, Zannie Neal, and their uncle, Arthur Darby, with two counts of first degree murder in violation of La. R.S. 14:30. After Darby turned state's witness and the court severed the brothers' cases, a jury found the defendant guilty as charged on both counts and, after a sentencing hearing, unanimously recommended a sentence of death. With respect to each count, the jury returned the following aggravating circumstances: (1) that the offender was engaged in the perpetration or attempted perpetration of an aggravated burglary; (2) that the offender was engaged in the attempted distribution, exchange, sale or purchase of a controlled dangerous substance; and (3) that the offender knowingly created a risk of death or great bodily harm to more than one person. La.C.Cr.P. art. 905.4(A)(1), (4), (11). The defendant now appeals his conviction and sentence, raising 20 assignments of error.[1] None of the claimed errors are meritorious. Therefore, we affirm the defendant's conviction and sentence.

FACTS AND PROCEDURAL HISTORY
On March 31, 1998, at approximately 11:30 p.m., armed intruders entered the Metairie home of Claudette Hurst with the apparent intent of collecting an overdue drug debt from her stepfather. Though her stepfather had moved out of the house a few weeks earlier, Hurst shared the home with her three children, her boyfriend Fergus Robinson, and her brother Carl Duncan. While sleeping in the living room with her younger daughter, Hurst was awakened by "some noise" and heard her boyfriend "telling someone to take it outside." She peeked around a wall into an adjoining room and saw a person (later identified as victim Greg Vickers) with a red hood over his head kneeling on the floor and a tall, thin person dressed in black clothing aiming a rifle at Robinson. Hurst and Robinson then ran to a bedroom in the back of the house where Carl Duncan and his girlfriend were smoking marijuana, and held the door shut against one of the intruder's repeated attempts to push his way into the room. Unable to enter the room, the intruder fired approximately six shots through the door, striking Robinson in the right leg and severing his femoral artery, and Duncan in the right arm; in addition, the subsequent investigation revealed that one of the intruders shot Vickers in the back of his neck and severed his carotid artery. Fergus Robinson and Greg Vickers died at the scene.
During this time, a next door neighbor, Seneca Johnson, and her boyfriend, Larry Osborne, were returning home from a nearby Shell station where they had purchased some food for Johnson who was seven weeks pregnant. While sitting in Osborne's car, they heard numerous gunshots and Osborne saw two men wearing ski masks running down the sidewalk. As the men approached his car, he noticed one of the men carried a rifle. In an effort to protect his girlfriend, he pushed her head down and leaned over her as a hail of bullets began riddling the car; however, despite Osborne's efforts a bullet struck Johnson in the buttocks. About thirty seconds after the shooting stopped, Osborne finally looked up and the two men were gone.
At the same time, an off-duty Jefferson Parish Sheriffs deputy had just dropped *653 his father off at home around the corner from the Hurst residence when he heard numerous gunshots and saw a black Toyota 4-Runner driving away "at a high rate of speed." The deputy immediately began following the 4-Runner in his marked police cruiser. After observing the 4-Runner run a stop sign and a red light, the deputy activated his lights and siren and radioed for backup; eventually, two more units joined in the chase. During the chase, the deputies observed a black male (later identified as the defendant) lean out of the passenger's window and begin shooting at them with an AK-47. Moments later, the defendant fell out of the 4-Runner and began running towards a nearby drainage canal. After a brief chase, deputies arrested the defendant and recovered the AK-47. Ballistics tests later showed that casings recovered from inside the 4-Runner and at the murder scene, and bullets recovered from Fergus Robinson were fired from the same AK-47. While deputies were arresting the defendant, the driver of the 4-Runner (later identified as Arthur Darby) jumped out of the vehicle and ran to some nearby houses where he hid for about 15 minutes until a K-9 unit located him. Darby was arrested and taken to Charity Hospital to be treated for dog bites. Deputies also arrested Zannie Neal who was sitting in the backseat of the 4-Runner.
On May 21, 1998, a Jefferson Parish grand jury returned an indictment charging Jarrell Neal, Zannie Neal, and Arthur Darby with two counts of first degree murder. Darby turned state's witness and testified at trial that the defendant and Zannie Neal came to his house the night of the murders and told him they were going to collect an overdue drug debt and needed a driver. Darby testified that Zannie was driving, he was in the front seat and the defendant was in the back seat. After they had gone about a block, Zannie asked Darby if he had his .38 pistol. When Darby told him "no," Zannie told him he might need it so they returned to Darby's house to retrieve the pistol. Darby further testified that when they arrived at the Hurst residence, Zannie told him to get in the driver's seat, which he did, with the engine running and the lights off. According to Darby, the defendant exited the vehicle with the AK-47 and he and Zannie went inside the house. Moments later, Darby heard numerous gunshots and Jarrell and Zannie Neal came running back to the 4-Runner. Darby also stated that when the men returned, the defendant held the AK-47 and Zannie had a pistol. The defendant told Darby to pull off fast and told him that "the nigger was down bad for trying to play him, but now he crying like a little bitch." Darby testified that Zannie told him that his gun jammed when a guy came at him and he hit him over the head and the gun went off and the bullet went in the floor.
At the sentencing hearing, the state called Fergus Robinson's mother and brother, and Greg Vicker's mother and co-worker to testify regarding victim impact evidence. The defense called seven witnesses, including the defendant's parents and maternal grandparents to describe his childhood and relationship with his 3-year-old son. As previously stated, following the penalty phase, the jury returned with a death recommendation on both counts.

DISCUSSION

VOIR DIRE
In Assignment of Error No. 1, the defendant claims that the state unconstitutionally used peremptory challenges to exclude three African American venire-persons from the petit jury in violation of the rule of Batson v. Kentucky, 476 U.S. *654 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The defendant argues that the state did not give a race-neutral reason for challenging Juror Sarbeck and that its explanations for challenging Jurors Eckles and Hawkins were "pretextual."
Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used his or her peremptory challenges to exclude potential jurors on account of race. The burden of production then shifts to the state to come forward with a race-neutral explanation, and if a race-neutral explanation is tendered, the trial court then must decide, in step three, whether the defendant has proven purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) (citations omitted); see also State v. Collier, 553 So.2d 815 (La.1989). The second step need not demand an explanation that is persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Purkett, 515 U.S. at 767, 115 S.Ct. 2440. The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id.; see also Batson, supra; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations and so his or her findings are entitled to great deference by the reviewing court. Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21.
The record reveals that after the state exercised peremptory challenges to exclude Juror Eckles, and shortly thereafter used a back strike against Juror Sarbeck from the previous panel, defense counsel did not object but rather the parties engaged in a discussion about their confusion of the "back striking" procedure. However, when the state then used a peremptory challenge to remove Juror Hawkins the following exchange occurred:
DEFENSE: Judge, that's two blacks.
COURT: Yes, sir.
DEFENSE: That have been excused. I saw nothing within the voir dire that would give them any reason to excuse other than they are black.
COURT: Either of these jurors?
DEFENSE: Either of those two.
COURT: The fact that two black jurors have been stricken in a row could lead one to the position that a prima facie case has been made.
STATE: Judge, if I may, they were not in a row. We went back and struck Ms. Sarbeck.
COURT: I used the wrong language. Two total.
STATE: I just want to clarify for the record.
COURT: Absolutely. I misspoke. It was two black jurors that have been stricken. I will, as to Juror Eckles, ask the prosecution to give a race neutral reason as to the reason Eckles has been stricken.
STATE: Are you saying that you find a pattern of exclusion?
COURT: I think the fact that two
STATE: If I may, Judge, before you make that ruling. He never brought it up on that juror and also we have an African American on the jury panel who was selected and accepted by the State. The State has used six challenges. Four of which have been on white people and two of which have been on black.
COURT: I did not say that there was a pattern.

*655 STATE: Okay. I'm sorry.
COURT: I said it could lead one to the feeling that there was because two black jurors have been stricken. I picked Eckles because my notes reflected a race neutral reason for the striking of Mr. Eckles.
STATE: Okay, Judge, with regard to Juror 185, Mr. Eckles, he had in my opinion, as the individual conducting the voir dire, some reticence with regard to the plea bargain and having to flip someone. He said he could probably I believe that was
COURT: His exact words was that he said he supposed that he is okay with the plea bargain. He hung up on the word "suppose," and the plea bargain with Darby. He made the statement, if it is the only way justice can be done, then okay. I, too, picked up on that and I found as to Eckles a race neutral reason for striking him so I don't think there is a pattern at this point, butso I am going to deny the motion. And I think as to Mr. Eckles, there was a race neutral reason.
STATE: Additionally, on Mr. Eckles, I had a question mark on the death penalty and I had a notation that he was weak on the death penalty as well.
DEFENSE: He was very strong on the death penalty. I was surprised.
COURT: My only reservation on the death penalty that I reflect on Eckles, and it was a different word than many people use. He said he was not opposed if the circumstances warranted it. It was not as strong as some of the other people, but I didn't pick up on it on the death penalty issue. But I've already ruled as to Mr. Eckles. I don't thinkI think there is a race neutral reason for striking Mr. Eckles.
STATE: I was just adding to the record.
COURT: I understand. All right, let's move on. Hawkins. Then the State is going to strike. At that point the State has used six challenges. The defense has used ten and we have ten juror[s] tentatively selected....
STATE: Judge, just beforesince he is in the courtroom, I would like the Court to take notice of it. Mr. Hawkins is carrying a bible with him. He brought it to court today and he has it with him in the jury box. And I am just using that as the reason why we have cut him from a death penalty case.
DEFENSE: What's wrong with the bible?
COURT: I'm certainly not going to tell them they can't take bibles to the hotel with them. To bring it into the courtroom, I think, would probably, in a death penalty case, raise and [sic] eyebrow with most people and I think it is certainly a wonderful attribute for any individual to read the bible, but to bring it into the jury box with them in the selection of a first degree murder jury probably would give rise to an issue. I, too, took note of the fact that Mr. Hawkins has a large, red bible on his lap. He's been clutching it to his chest during much of the examination and I did not know it was a bible. If you are satisfied that it is a bible, I'll take note of that. I[t] would give me cause for concern and I think it would be another race neutral reason for striking Mr. Hawkins.
DEFENSE: Well, note my objection, Your Honor.
COURT: Yes, sir.

*656 DEFENSE: And also note that there is only one other black potential juror in the entire jury panel.
COURT: I don't know if everyone is in the courtroom at this time.
DEFENSE: Well, that's true. That's true.
COURT: They're on a break.
DEFENSE: That is true.
COURT: They are in the hallway. I think we probably need to look at it later. The record will reflect that I would estimate that approximately twenty percent of the potential jurors, including two that are walkingor one that is walking in at this time, are African Americans.
DEFENSE: I didn't know they were out.
COURT: Yes, sir.
As an initial matter, it is unclear from the colloquy whether the trial court found that the defendant made a prima facie showing of racial discrimination which required the state to provide race-neutral reasons for exercising its challenges. The trial court first noted that it did not believe the state had a pattern of removing African Americans from the venire, but then asked the state to provide a race-neutral reason for excusing Juror Eckles and stated that the state's actions "could lead one to the feeling that there was [a pattern of discrimination] because two black jurors have been stricken." Notwithstanding these mixed signals, we find no error regarding Juror Sarbeck as the court apparently concluded that as to Juror Sarbeck the state did not establish a prima facie case of discrimination because the court did not ask the state to provide a race-neutral reason for its challenge. Further, the defense never specifically objected to the state's challenge of Juror Sarbeck, when it had numerous opportunities to do so.
As to Jurors Eckles and Hawkins, the trial court rendered the question of whether defense counsel had established a prima facie case of discrimination moot when it asked the prosecutor for his race-neutral reasons for qualifying the jurors. Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.")
We find no error in the court's ruling upholding the state's use of its peremptory challenges of Jurors Eckles and Hawkins. It appears the state validly chose to strike Juror Eckles based on his reluctance regarding the state using the testimony of a co-perpetrator turned state's witness. Because the state's case against the defendant depended in large part on the jury believing Arthur Darby's testimony, the state's apprehension concerning Juror Eckles was understandable and was not race-based, and/or was race-neutral. As to Juror Hawkins, the state chose to strike him because he carried a bible, which the state evidently concluded (as the trial court did) to be a sign of the juror's religious convictions and possible disinclination to impose the death penalty. Any response will qualify as race-neutral "unless a discriminatory intent is inherent in the prosecutor's explanation." Hernandez, supra, 500 U.S. at 364-66, 111 S.Ct. 1859. In this situation, besides telling the trial court to "note my objection," the defendant did nothing to demonstrate that the state intended to discriminate against African American jurors or that the court abused its discretion when it accepted the state's race-neutral explanations for its *657 challenges. This assignment of error lacks merit.

GUILT PHASE

Specific Intent and Jury Instruction on the Law of Principals
In Assignment of Error No. 3, the defendant claims that the state presented insufficient evidence to prove he had the required specific intent to kill the victims. His argument is twofold. First, he argues that the state's evidence was purely circumstantial and insufficient to prove that he was the masked shooter, as no witnesses (other than Arthur Darby, a coperpetrator turned state's witness) identified him as the shooter. Second, he argues that the trial court erroneously instructed the jury on the law of principals and thereby empowered the jury to convict him based solely on the defense theory that he stayed in the 4-Runner while Zannie Neal and Arthur Darby murdered the victims.
"In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury. State v. Rosiere, 488 So.2d 965, 968 (La. 1986).
To convict the defendant of first degree murder, the prosecution was required to prove: 1) that the defendant specifically intended to kill the victims during the perpetration or attempted perpetration of an aggravated burglary; (2) that the defendant was engaged in the attempted distribution, exchange, sale or purchase of a controlled dangerous substance; and 3) that the defendant knowingly created a risk of death or great bodily harm to more than one person. La. R.S. 14:30(A)(1), (4), (7). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. R.S. 14:10(1); State v. Butler, 322 So.2d 189, 192-93 (La.1975); State v. Martin, 92-0811, p. 3 (La.App. 5th Cir.5/31/94), 638 So.2d 411, 413-14. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Sullivan, 596 So.2d 177, 190 (La.1992); State v. Williams, 383 So.2d 369, 373 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981); State v. Procell, 365 So.2d 484, 492 (La.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979).
The question before this Court is not so much whether the evidence was legally sufficient to prove the shooter's specific intent (clearly an offender who uses a high powered assault rifle and shoots indiscriminately through a door at a group of people specifically intends to kill the victims), but whether the evidence was legally sufficient to prove the defendant's identity as the perpetrator. To that end, the primary evidence that the defendant was the shooter is the trial testimony of *658 the defendant's uncle, Arthur Darby. The defendant alleges that Darby murdered the victims and then falsely implicated the defendant to avoid the death penalty; in support, the defendant notes that Darby admitted on cross-examination that he would "do anything and say anything" to avoid the death penalty.
As explained previously, Arthur Darby testified that on the night of March 31, 1998, he was asleep at home when his nephews, Jarrell and Zannie Neal, awakened him and told him they needed his assistance in collecting an overdue drug debt. According to Darby, when they arrived at the Hurst residence, the defendant exited the 4-Runner with an AK-47 and he and Zannie went inside the residence. Moments later, Darby heard gunshots and the defendant (still carrying the AK-47) and Zannie Neal came running back to the vehicle. Darby further testified that as they fled from the scene the defendant said "the nigger was down bad for trying to play him, but now he crying like a little bitch."
Although the defendant did not testify, his position at trial was that he used the AK-47 to shoot at sheriff's deputies while fleeing the murder scene, but that he did not shoot the victims. He instead claims that he waited in the 4-Runner while Arthur Darby and Zannie Neal went inside the house and that Darby shot the victims. To support his version of events, the defendant points to the following testimony: 1) Claudette Hurst described the shooter as a tall, thin person dressed in black clothing; 2) a deputy sheriff stated that when arrested the defendant was wearing "a light brown pair of khaki pants"; and 3) Darby admitted wearing a black sweater and blue jeans the night of the murder, described himself as "rather thin," and acknowledged that the defendant was not "skinny" or "thin."
As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Smith, 430 So.2d 31, 45 (La.1983); State v. Brady, 414 So.2d 364, 365 (La.1982); State v. Long, 408 So.2d 1221, 1227 (La.1982). However, positive identification by only one witness is sufficient to support a conviction. See State v. Mussall, 523 So.2d 1305, 1311 (La.1988) (generally, one witness's positive identification is sufficient to support the conviction); State v. Ford, 28,724 (La. App.2d Cir.10/30/96), 682 So.2d 847, 849-50, writ denied, 99-0210 (La.5/14/99), 745 So.2d 12. In the instant case, the jury heard Hurst's description of the offender and the witnesses' testimony regarding the defendant's and Darby's clothing and physique, but, nevertheless, accepted Darby's testimony implicating the defendant. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." Mussall, 523 So.2d at 1310 (La.1988).
Moreover, though Darby testified pursuant to a favorable plea agreement, the jurisprudence in Louisiana generally holds that an accomplice is qualified to testify against a co-perpetrator even if the prosecution offers him inducements to testify; such inducements would merely affect the witness's credibility. State v. Gunter, 208 La. 694, 23 So.2d 305 (1945); State v. Jenkins, 508 So.2d 191, 194 (La. App. 3d Cir.1987), writ denied, 512 So.2d 438 (La.1987); cf. State v. McCullough, 98-1766 (La.App. 3d Cir.12/29/98), 737 So.2d 49, writ denied, 99-0259 (La.2/26/99), 738 So.2d 590 (testimony of co-defendant, *659 who pled guilty to reduced charge of manslaughter, against other defendants in first degree murder trial did not violate the public bribery statute). As the United States Fifth Circuit has found, "a conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face." United States v. Osum, 943 F.2d 1394, 1405 (5th Cir.1991). In the instant case, defense counsel had knowledge of Darby's agreement with the state and its terms; and though counsel cross-examined Darby about it at length in an effort to undermine his credibility, the jury apparently determined that he told the truth about his and the defendant's involvement in the murders.
Concerning the principals instruction, as a general matter, a trial judge has the duty to instruct jurors as to "every phase of the case supported by the evidence whether or not accepted by him as true," and that duty extends to "any theory... which a jury could reasonably infer from the evidence." La.C.Cr.P. art. 802; State v. Marse, 365 So.2d 1319, 1323 (La. 1978); cf. State v. Johnson, 438 So.2d 1091, 1097 (La.1983) (defendant not entitled to negligent homicide instruction because that "defense [not] fairly supported by the evidence" and "charge must be supported by the evidence"); State v. Henry, 449 So.2d 486, 488 (La.1984) (same). The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. See La. R.S. 14:24. However, the defendant's mere presence at the scene is not enough to "concern" him in the crime. State v. Schwander, 345 So.2d 1173, 1174-75 (La.1977). Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. State v. Knowles, 392 So.2d 651 (La.1980). A principal may be connected only to those crimes for which he has the requisite mental state. State v. Holmes, 388 So.2d 722 (La.1980).
The facts of the present case warranted the principals instruction because the evidence indicates that the defendant was involved in the commission of the instant offenses along with two other people. Darby's testimony and the defendant's actions while fleeing the scene prove that the defendant knowingly participated in the planning and/or execution of the crime. Accordingly, this assignment lacks merit.

Brady Violations
In Assignment of Error No. 5, the defendant argues that the state withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, the defendant alleges that the state failed to provide forensics reports which revealed the possible presence of blood on the bottom of Arthur Darby's shoes, and also indicated that a bloody shoe print at the crime scene did not match the defendant's shoes but possibly matched Zannie Neal's shoes.[2] These forensic reports are not *660 part of the record but were attached to the defendant's brief as Exhibits. The defendant argues that the reports have clear impeachment value in that they undermine Darby's testimony that he remained in the 4-Runner while the defendant and Zannie Neal committed the murders.
After briefs were filed and oral argument heard in this Court, the state filed a Motion to Supplement the Record with a letter dated January 19, 1999, addressed to each defendant's attorney and enclosing various reports, including the reports the defendant now claims were never turned over to him before trial. The date of January 19, 1999, is just over a month before the defendant's trial began. Further, the state subsequently filed a Motion to Supplement the Motion to Supplement the Record with the green domestic return receipt from the post office which the state claims indicates that counsel for the defendant, Ralph Barnett, did receive the letter and the enclosed materials at issue. The defendant filed an Opposition to the Motion to Supplement, claiming that the record belies the state's claim that trial counsel received this material because if he had, he would have used the material at trial to impeach the state's witnesses and would have pursued DNA testing on this evidence.
There is insufficient evidence in this record for this Court to determine (1) whether the defendant's trial counsel received the reports prior to trial, and (2) if he did not, whether these report contained exculpatory material under Brady. Accordingly, this claim is relegated to post-conviction relief, where an evidentiary hearing may be conducted to develop a sufficient record on the issues raised.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI"). In addition, the state also submitted a Sentence Review Memorandum.
The CSI indicates that the defendant is an African American male born on February 19, 1977. He was twenty-two years old at the time of the offenses. The defendant has a five-year-old son named Jarrell Neal, Jr. In addition, the defendant's immediate family includes his parents, *661 maternal grandparents, and two siblings. Testimony taken at the sentencing hearing reveals that the defendant grew up in a "very close family" and that his father was a constant presence in his life and worked very hard to provide for his family. In addition, as a child the defendant often cared for his mother, who suffered from cancer while pregnant with him and as a result of the cancer had to have her arm amputated. Neither the CSI or UCSR contains information on his educational, work, or medical history since the defendant and his family apparently were uncooperative in providing such information.
The CSI reveals that the defendant is a third felony offender with four felony convictions. No juvenile record was indicated or found. His adult record shows convictions for concealed weapon, possession of crack cocaine (2 counts), felon with a firearm, aggravated assault (6 counts), and simple battery (2 counts). According to the UCSR, no psychiatric evaluation was conducted.

Aggravating Circumstances
At trial, the state argued the following aggravating circumstances existed for both counts: (1) that the offender was engaged in the perpetration or attempted perpetration of an aggravated burglary; (2) that the offender was engaged in the attempted distribution, exchange, sale or purchase of a controlled dangerous substance; and (3) that the offender knowingly created a risk of death or great bodily harm to more than one person. La.C.Cr.P. art. 905.4(A)(1), (4), (7). The jury found the existence of all the aggravating circumstances urged by the state on each count. Though the defendant argues that the aggravating factors were not supported by the evidence, as explained previously, this allegation has no merit. Even assuming that jurors incorrectly found that the murders had occurred during a drug transaction, the evidence fully supported the jury's finding of the other two aggravating circumstances relied upon by the state.

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This Court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although it effectively de-capitalized another death penalty reversed on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
The state's Sentence Review Memorandum reveals that since 1976, 71 cases have originated as first degree murder charges in Jefferson Parish, including the defendant's case, and of those, juries have recommended imposition of the death penalty 23 times, including the current case. Of those 23 cases in which the juries recommended death, 12 of those juries found at least one of the three aggravating circumstances found by the defendant's jury. All *662 of these cases involved the aggravating circumstance that the offender created a risk of death to more than one person. See State v. Berry, 391 So.2d 406 (La. 1980), cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981) (defendant fatally shot a law enforcement officer during a bank robbery with 12 other people nearby); State v. Smith, 391 So.2d 1182 (La.1980) (defendant fatally shot victim who was waiting with two companions in a parking lot); State v. Robinson, 421 So.2d 229 (La.1982) (defendant killed the husband of an apartment complex manager in her presence during an armed robbery); State v. Lowenfield, 495 So.2d 1245 (La. 1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986) (defendant shot and killed his ex-girlfriend, her daughter, her parents and her current boyfriend); State v. Weiland, 505 So.2d 702 (La.1987) (defendant stabbed his girlfriend and her ex-husband, killing the female victim); State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998) (defendant employed a "hitman" to kill his wife and her friend); State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000) (defendant shot two of his co-workers, one fatally, during the course of an armed robbery); State v. Harris, (appeal pending before this Court in case No. 01-KA-0408) (defendant shot and killed two pedestrians in a drive-by shooting); State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832 (defendant stabbed his wife and her new boyfriend, killing the boyfriend and this Court conditionally affirmed his conviction and death sentence, but remanded the case to the trial court for a retrospective determination of his competence to stand trial; if a retrospective determination cannot be made, or if it is determined that defendant was not competent at the time of trial, defendant shall be entitled to a new trial); State v. Jacobs; State v. Bridgewater, (appeal pending before this Court in case No. 00-KA-1529) (defendants committed a double murder of an adult male victim and his mother during the course of an aggravated burglary); State v. Lam, (appeal not yet filed before this Court) (defendant entered the home of a former employer and shot four people, two of whom died, and then shot himself in an unsuccessful suicide attempt); State v. Mathews, (appeal not yet filed before this Court) (defendant shot and killed the owner of a convenience store and fired another shot at a customer but missed).
The outline of the cases above provides strong support for an argument that the death penalty imposed in this case is not disproportionate. Despite that only two cases involved the aggravating circumstance of an aggravated burglary, State v. Robinson, supra; State v. Jacobs/Bridgewater, and that none of the 23 cases involved a killing while the offender was engaged in the attempted distribution, exchange, sale or purchase of a controlled dangerous substance, because this Court has overwhelmingly upheld death sentences in cases where a defendant creates the risk of death or great harm to more than one person, the death sentence imposed in this case is not disproportionate.

DECREE
For the reasons assigned herein, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their *663 prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. Art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
WILLIAMS, J. Pro Tem., dissents.
PER CURIAM.
Application for Rehearing Granted in Part for Clarification; Otherwise Denied.
In his Application for Rehearing, the defendant claims this Court erred in finding that defendant was not entitled to a "grace instruction" at the sentencing phase of trial. In addressing Assignment of Errors Nos. 15, 16, and 18 at pages 64 and 65 of the unpublished appendix, we stated that "the judge instructed the jury that even the finding of an aggravating circumstance did not require a determination of the death penalty" and that "the jury was told of its duty to consider any mitigating circumstances before deciding the death penalty should be imposed." See Unpublished Appendix at p. 64. In light of these instructions and the fact that the defendant did not make a "grace instruction" request, we found that the claim had no merit. In his Application for Rehearing, the defendant claims that he did in fact make such a request.
The transcript at the sentencing phase of trial reflects the following:
THE COURT: ... Mr. Barnett, for the record, what are your objections to the jury charges?
MR. BARNETT: Your honor, I haveI have a specific objection and I have a general objection to the entire charge.
THE COURT: Let the general objection be noted. What is your specific objection?
MR. BARNETT: My specific objection is that I believe that the closing instructions should include as we selected the death qualified jury, the District Attorney and then I took it upon myself with his opening, is that even if there is no testimony to mitigating circumstances, or even if the defendant remains silent during this hearing, penalty phase, ....
THE COURT: Yes, sir....
MR. BARNETT: ... that they would be qualified only if the [sic] still could consider life imprisonment.
THE COURT: I'm satisfied that the jury was thoroughly voir dired on the death penalty and that they showed a willingness to consider either a death penalty or life imprisonment.
They knew from the very beginning that those were the two options that they would face if the defendant was convicted of first degree murder.
With that, they were quizzed at that time and will be instructed at this time as to mitigating and aggravating circumstances.
Specifically, as to mitigating circumstances, the charge states that in addition to those specifically provided mitigating circumstances, which will be the statutory mitigating circumstances that will be given to the jury in a list, the charge states, "That you must also consider any other relevant mitigating circumstance."

*664 Now, that is a duplication of "H" in the list, the statutory mitigating circumstances; its a duplication. So, at this point, it would have been said twice; any other mitigating circumstance.
The charge then goes on to say. "You are not limited only to those mitigating circumstances which are defined. You may consider any other relevant circumstances which you feel should mitigate the severity or the penalty to be imposed."
The court's of the opinion that, that is broad enough to allow the jury to determine that they would opt any individual juror, if he or she might opt for any relevant circumstance which they might feel would mitigate the severity of the penalty to be imposed, which would then push them into a decision as to life imprisonment.
I'm not going to give a charge that says that they do not need any reason to decideto go with the life sentence, because I'm afraid that, that would create an environment where the juror would not be following his oath, which was to consider both the life and death options.
So, I'm going to go with the charge as its printed, but I will note the objection by counsel.
The trial judge's determination was correct. We stated in the appendix to the opinion that no "grace instruction" was requested because we do not consider defendant's requested instruction to be a "grace instruction." We traditionally understand a "grace instruction" to be an instruction that the jury is not required to find a mitigating circumstance in order to recommend a life sentence. The requested instruction in this case was unclear, but at most appears to be a request for an instruction that the defendant need not affirmatively present evidence of mitigating circumstances in order for the jury to consider life imprisonment. However, there is no requirement that the jury must be instructed that the defendant does not have to testify himself as to mitigating circumstances. Further, in this case, the defendant presented seven witnesses to testify as to mitigating circumstances on his behalf, including his parents and maternal grandparents, and these witnesses gave substantial testimony in that regard.
With this clarification, the defendant's Application for Rehearing is DENIED.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon. Judge Felicia Toney Williams, of the Second Circuit Court of Appeal, assigned as Justice Pro Tempore, sitting for Associate Justice Bernette J. Johnson.
[1] Assignments of error not treated in this opinion are addressed in an unpublished appendix to this opinion.
[2] The first report, Jefferson Parish Sheriff's Office Analysis Report dated December 8, 1998 and prepared by Pamela Williams, reveals that the forensics scientist discovered "debris" on the bottoms of Arthur Darby's left shoe (specimen 13) and the defendant's left shoe (specimen 78), and that "preliminary analysis indicated the possible presence of blood" on both shoes. The report, however, states that "[d]ue to limited sample size, no further analysis was performed." The defendant also claims that the state failed to turn over Pamela Williams' handwritten notes of April 25, 1998, from which the December 8, 1998 report was made, and which states that Darby's left shoe tested "ph(+)" and that the shoe was "Save[d] for Possible DNA." The defendant claims that these reports suggest that Darby may have stepped in blood, which is inconsistent with his testimony that he stayed in the 4 Runner while the defendant and Zannie Neal went inside the Hurst residence.

The second report, Jefferson Parish Sheriff's Office Crime Lab Analysis Report dated January 6, 1999 and prepared by Charles Krone, reveals that the forensics scientist compared the soles of shoes recovered from the defendant, Zannie Neal, and Arthur Darby to a bloody shoe print on a piece of floor tile, and that the defendant's and Darby's shoes did not match. However, the report states that "[t]he shoe sole pattern of the shoes, specimen # 27 [Zannie Neal], cannot be excluded as the possible origin of the partial print.... The insufficient amount of detail of the print precluded any conclusive comparison."