# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-948

**STATE OF LOUISIANA**

**VERSUS**

**NATHANIEL MCCOY, JR.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 14-K-0508-D
HONORABLE D. JASON MECHE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## DAVID E. CHATELAIN\*
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of D. Kent Savoie, Van H. Kyzar, and David E. Chatelain, Judges.

**AFFIRMED.**

_____
      \*Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Paula C. Marx**
**Louisiana Appellate Project**
**P. O. Box 80006**
**Lafayette, LA 70598-0006**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Nathaniel McCoy, Jr.**

**Earl B. Taylor**
**27th JDC District Attorney**
**Jennifer M. Ardoin**
**Assistant District Attorney**
**P. O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**CHATELAIN, Judge.**

The defendant, Nathaniel McCoy, Jr., appeals his manslaughter conviction. For the following reasons, we affirm the defendant's conviction and sentence.

## PROCEDURAL HISTORY

On April 30, 2014, a St. Landry Parish grand jury returned a true bill, charging the defendant with the second degree murder of Robbie White (White), a violation of La.R.S. 14:30.1. The defendant was arraigned on June 26, 2014, where he entered a plea of not guilty. Jury selection occurred on May 3, 2016. Trial was continued until May 23, 2016. The trial took place over May 23 – 25, 2016. By a vote of ten to two, the jury found the defendant guilty of the lesser responsive verdict of manslaughter, a violation of La.R.S. 14:31.

The defendant timely appealed his conviction and asserts two assignments of error. First, the defendant asserts that the trial court erred in allowing the introduction of "other crimes" evidence that was not timely provided to him; his contention is twofold: it violated the trial court's scheduling order and did not comply with the rules of discovery in criminal matters. Second, the defendant asserts that the State failed to prove that he killed White and challenges the sufficiency of the evidence to support a manslaughter conviction.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, we find one error patent.

The court minutes show that the trial court failed to delay sentencing for twenty-four hours after it denied the defendant's "Motion for Judgment of Acquittal or in the Alternative Motion for New Trial."

Louisiana Code of Criminal Procedure Article 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

There was no express waiver of the delay in this case; however, any error is harmless because the defendant does not argue excessiveness of his sentence on appeal and does not claim he was prejudiced by the lack of the delay. *State v. Frank*, 15-893 (La.App. 3 Cir. 5/25/16), 192 So.3d 888; *State v. Cortes*, 11-794 (La.App. 3 Cir. 2/1/12), 84 So.3d 733.

## SUFFICIENCY OF THE EVIDENCE

The defendant asserts the State failed to prove beyond a reasonable doubt that he was the person who killed White. Thus, the defendant contends the evidence was insufficient to support the responsive verdict of manslaughter.

"When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992). The rationale is that "[w]hen the entirety of the evidence . . . is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot." *Id.*

The analysis for insufficiency of the evidence claims is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and

therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As to the defendant's assertions that the State failed to prove beyond a reasonable doubt that he killed White, the supreme court in *State v. Hughes*, 05-992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051, held:

> [W]hen the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 03-3067 (La.4/24/06), 931 So.2d 297; *State v. Neal*, 00-0674 (La.6/29/01), 796 So.2d 649. Positive identification by only one witness is sufficient to support a conviction. *Weary*, 03-3067 at p. 18, 931 So.2d at 311; *Neal*, 00-0674 at p. 11, 796 So.2d at 658; *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State v. Bright*, 98-0398, p. 22 (La.4/11/00), 776 So.2d 1134, 1147.

Moreover, in discharging our review function, we consider "*all of the evidence*" before the actual fact-finder. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). The United States Supreme Court has explained that the standard of review for sufficiency of evidence is highly deferential to the fact-finder because it "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. "The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Id*.

Similarly, "[a] reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review." *State v. Macon*, 06-481, p. 8 (La. 6/1/07), 957 So.2d 1280, 1285. "It is not the

3

function of an appellate court to assess credibility or re-weigh the evidence." *Id*. at 1286. The Due Process Clause of the Fourteenth Amendment, the source of the *Jackson* standard, does not countenance, much less require, that we re-weigh testimony and witness credibility. And "[i]n criminal cases [a court of appeal's] appellate jurisdiction extends only to questions of law." La.Const. art. 5, § 10(B).

"Therefore, in discharging our review function for sufficiency of evidence, we cannot re-weigh or re-consider" reasonable inferences drawn from basic facts to ultimate facts. *State v. Gilmore*, 10-59, p. 7 (La.App. 4 Cir. 10/6/10), 50 So.3d 208, 213, *writ denied*, 10-2491 (La. 3/4/11), 58 So.3d 478. "We must confine ourselves to questions of law except to the extent, and only to the extent, that *Jackson* mandates otherwise." *Id.*

The crime of manslaughter includes "[a] homicide which would be murder . . . under Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). Second degree murder is defined as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; they are only mitigating factors lessening the culpability of a defendant. *State v. Lombard*, 486 So.2d 106 (La.1986).

Against that jurisprudential backdrop, we will now examine the evidence presented at trial in this matter to determine whether the jury in this case could have found that the State proved beyond a reasonable doubt that the defendant was the one who killed White.

On January 28, 2014, White was shot multiple times and killed. Although there were no eyewitnesses to the murder, the defendant was seen with the victim

4

shortly before the murder, and the gun used in the murder was found just after the shooting in the defendant's father's house. What follows is the other evidence the jury heard at trial.

Cheryl Wells (Wells), White's girlfriend, testified. She stated that sometime prior to White's death she received a call on her cell phone from the defendant claiming that White owed him $50. Wells testified that she told White about the call and gave him $50 to pay the defendant, but she does not know whether White ever paid him.

Wells also testified to hearing an argument between White and the defendant about two months before White's death, but she did not know what the argument was about. However, on cross-examination, Wells admitted that during her interview in the early morning hours after White's death she told the police that White had been threatened by Michael Taylor[1] (Taylor) and that the defendant had not threatened White.

Next, Wells testified that on the day of the murder she had driven White around town so that he could cut hair. Sometime between approximately 4:30 p.m. and 6:00 p.m. on that day, Wells dropped White off near "Pop's"[2] house and then went home. She did not see White again before his death.

Sedera Andres (Andres) testified she was in a relationship with the defendant on January 28, 2014. She testified that on that day she was with the defendant and Taylor at 1725 Caddo Street (Caddo house), the defendant's father's house. Andres testified that she, the defendant, and Taylor walked to her sister's,

---

[1] Wells did not know Taylor's name; she knew him by "Maul" and knew that "Maul" had been arrested with the defendant on the night of White's death. Taylor was the only person arrested with the defendant. Further, Taylor indicated during his testimony that his nickname is "Maul."

[2] Wells does not know "Pop's" real name, and no location is given for "Pop's" house except that it was near White's sister's house which was "around the corner off of 182[.]"

Aryonte Joseph (Joseph), apartment to eat dinner that day. Andres stated that the defendant left to walk to the store before she heard the gunshots. Although she could not exactly recall, Andres testified that she believes that Taylor left with the defendant at that time. Andres remembered calling the defendant a few times prior to hearing the gunshots, and the defendant informed her that he was almost at the store. After hearing the gunshots, Andres called the defendant to check on him. The defendant informed her that he was okay and that he was on his way back. Nevertheless, the defendant never made it back to Joseph's apartment.

Once the police "picked up" the defendant, Andres called the defendant's father. Andres and her sister then walked to the defendant's father's house where she saw the defendant's father waiting outside. After the defendant's father gave the police permission to search the house, he gave them a key to enter the house. Andres heard the police officers searching in the bedroom and saw them exit with a black gun.

Joseph testified that the defendant, Andres, and Taylor had all come over to her apartment throughout the day. Joseph testified that Taylor left a little while before the defendant left to go to the store. Joseph stated that the defendant left her apartment fifteen to thirty minutes before she heard the gunshots.

Taylor testified that on January 28, 2014, he went to the Caddo house. Taylor testified that he went with the defendant and Andres to Joseph's apartment. When asked if he had taken any drugs that day, Taylor stated that he took Xanax. After he ate at Joseph's apartment, Taylor and the defendant went back to the Caddo house. Taylor testified that he fell asleep on the sofa and woke up to the defendant telling him the police were outside. He did not hear the gunshots. When asked about things he saw or did on January 28, 2014, Taylor denied seeing White, denied seeing any confrontation between the defendant and White, denied going to

6

Paul Lavine's (Lavine) house, denied going to the store with the defendant, denied shooting the gun at White, and denied being present when White was shot.

Elizabeth Seraille (Seraille) testified that on January 28, 2014, she was at her sister's apartment. Seraile testified that a little before 8:00 p.m. she went to Mr. Paul's house, which is right across from her sister's apartment. While at Mr. Paul's house, Seraille testified that she saw the defendant, White, and Mr. Paul. Seraille heard a conversation between the defendant and White while she was there. Seraille testified that the defendant said to White, "You wrong for what you did" to which White responded "Oh man, what you talking about?" Seraille then testified that White tried to offer the defendant a phone, which he refused. The defendant and White then left Mr. Paul's house, followed by Seraille. She testified that she went to her sister's apartment, and the defendant and White went off in a different direction. After getting back to her sister's apartment, Seraille testified that she put her food in the microwave briefly to warm it up and that she heard the gunshots about a minute after getting back to her sister's apartment.

Lavine testified that White had been at his house around 12:00 p.m. or 1:00 p.m. on January 28, 2014. Lavine testified that he did not see or hear the defendant on that day. Lavine stated that after White left his house he went to sleep. Lavine testified that he was lying down on the couch in his living room when he heard the gunshots. Lavine testified that he did not hear a conversation between White and the defendant right before White was shot. Lavine also did not recall Seraille coming to his house before the shots were fired; he testified that he remembered her coming over after he heard the gunshots.

Tanika Lemon (Tanika) testified that she was at her cousin's, Latwounna Lemon (Latwounna), apartment on January 28, 2014. Tanika was leaving Latwounna's apartment right before the gunshots were heard. Tanika was headed

to the store in a "tanish [sic] gold" Toyota Corolla. Tanika testified that she did not see anyone outside when she walked to the car. While backing the car up to leave the parking lot, Tanika testified that she heard the gunshots. After being reminded, Tanika admitted that she did see "an individual with a big jacket, medium build, medium height," but that she did not know who the person was, although she thought it was a man because of the person's build. She further testified that it was dark, and she had to look over her shoulder, so she could not see very well. Tanika testified that she did not make it off of Caddo Street, because by the time she reached the end of the street, the police were already coming and had surrounded her car.

Latwounna testified next. She indicated that she did not initially realize that she heard gunshots until the children in the apartment told her that there was someone in the backyard. Latwounna testified that she then went outside and realized it was White on the ground. Latwounna testified that she did not see the shooter. She also testified that a lot of people were calling her while she was outside with White. Latwounna testified that the defendant called her several times while she was outside, and stated that she did not think that she answered his phone calls.

Tanika's son, Davion Lemon (Davion), testified at the trial. Davion stated that he was at Latwounna's apartment at the time of the shooting. Davion ran to the backdoor to check on his mother when he heard the shots. He saw her pulling away and saw a man lying on the ground. Davion stated that he also saw who he believed to be a short[3] man wearing a big black jacket with a hood. However, Davion admitted that he did not have his glasses on at the time.

---

[3] Davion testified that he considered "short" to be around 5′6″ or a little taller.

8

Braylon Lemon (Braylon), Latwounna's son, was also at her apartment on the night of the shooting. Braylon testified that he also ran to the backdoor when he heard the shots fired. He saw a man lying on the ground with his hand in the air and another man walking off wearing a black jacket with a hood. At trial, Braylon testified that the man was of medium height, but was reminded of his statement to the police after the shooting that the man was a couple inches taller than 5′2″.

Patrick Layssard (Layssard), a multiple felony offender who was incarcerated at the time of trial, testified that he knew White and the defendant. Approximately a week prior to White's death, Layssard testified that he saw the defendant and White arguing. He heard the defendant say, "You better have my f***ing money unless I'm going to put this on you." At which point, Layssard testified that the defendant reached behind his back and pulled out a black gun, which he did not point at White, and then the defendant said that he would "put this motherf***ing s*** on you - - this right here on you the next time I see you if you don't have my money." Layssard stated that he was not offered anything in exchange for his statements or testimony in this case.

Sergeant Crystal LeBlanc of the Opelousas Police Department was the lead detective in this case. She testified that shortly after White was shot a be-on-the-lookout (BOLO) was issued for the defendant and "another black male suspect" driving a "four door gray car[.]"

Sergeant LeBlanc was questioned about the various height descriptions of the person seen with White that night given to her during her investigation. Sergeant LeBlanc's report stated that the person seen with White was tall.[4] When asked whether she thought Davion and Braylon's description of the person as

---

[4] The report says "talk male subject," but Sergeant LeBlanc testified that she meant "tall male subject."

9

"short" was dispositive, Sergeant LeBlanc testified she did not consider the children's description dispositive for several reasons. First, Davion admitted he was not wearing his glasses, and when she considered that fact with her own knowledge of the "cross pattern" on the screen door of the apartment and her own experiences of trying to see things without her glasses, she felt there could be some discrepancies in Davion's assessment of the person's height. Second, Sergeant LeBlanc also considered the fact that "children have a tendency to talk with each other as far as what they may" have seen and since she did not know whether they had spoken to each other before she interviewed them she did not consider their testimony dispositive as to the person's height. Sergeant LeBlanc testified that she did consider it dispositive when Tanika described the person as being of medium height. When asked how she would describe the defendant's height,[5] Sergeant LeBlanc testified that she would consider him tall, but admitted she could not account for other people's subjective points of reference for their height descriptions.

Ronnie Hegger, a lieutenant over the lockdown unit at Pine Prairie Correctional Facility, testified that he came into contact with the defendant in the medical unit on February 16, 2015. Lieutenant Hegger stated that in response to a direct order to turn around and be handcuffed, the defendant said "F*** you, I know where you stay and I'll kill you like I killed that boy from Opelousas." Lieutenant Hegger testified that there were other prisoners present when the defendant threatened him.

Kassie Suire (Suire) testified at trial that she saw the defendant in Carencro, Louisiana, at her aunt's house on January 22, 2014, just six days before White's murder. Suire testified that she saw the defendant with a black gun that he fired

_____

[5] The defendant asserts that he is 6′3″ in height.

inside her aunt's house. The Lafayette Parish Sheriff's Department responded to the scene. Detective Michael Fincher took the bullet and cartridge cases recovered from the house to the Louisiana State Police Crime Laboratory for analysis.

On January 28, 2014, several officers from the Opelousas Police Department responded to the scene. Lieutenant Rodney May testified at trial that he collected the cartridge cases found around White's body; he also identified a big black jacket that was seized from the Caddo house along with the rest of the defendant's clothing. Sergeant LeBlanc found a black Glock and a magazine in the top of a closet in the defendant's father's house on Caddo. Lieutenant May collected the gun and magazine located at the Caddo house approximately an hour and a half after the murder; there were two live rounds in the gun when it was located. Sergeant Kerry Sam swabbed the collected evidence for DNA. Sergeant Jody White, the evidence custodian on January 28, 2014, took the evidence to the Louisiana State Police Crime Laboratory for analysis.

Patrick Lane (Lane), a Crime Lab Analyst with the Louisiana State Police Crime Laboratory, was accepted as an expert Forensic Science/Crime Lab Analyst with a specialty in firearm identification. Lane examined the gun, bullets, and cartridge cases recovered in this case. Lane was able to determine that the gun recovered from the closet at the Caddo house was the one that fired the cartridges collected at the scene; he was unable to match the bullets because they "lack[ed] sufficient detail to identify." Lane also conducted the forensic examination of the bullets and cartridges recovered in the shooting in Lafayette Parish, and he was able to match the cartridges recovered with the gun seized from the Caddo house, but he was again unable to match the bullets because they too "lack[ed] sufficient detail to identify."

Phillip Simmers (Simmers), a DNA analyst with the Louisiana State Police Crime Laboratory, was accepted as an expert in the field of Forensic Science with a specialty in DNA analysis. Simmers had a DNA profile from the defendant, White, and Taylor. On the swabs from the gun, Simmers found an "uninterpretable mixture of DNA from multiple individuals." The swabs taken from the cartridge cases did not produce enough DNA to generate a profile suitable for comparison. The fingerprint on the gun produced an incomplete DNA profile, preventing Simmers from making any conclusion regarding the inclusion or exclusion of the defendant as a contributor; however, he was able to exclude White and Taylor as contributors to that profile.

After reviewing all the evidence presented at trial "in the light most favorable" to the State, we find that the jury in this case could have found the essential elements of the crime of manslaughter proven beyond a reasonable doubt.

### Hypothesis of Innocence

In this assignment of error, the defendant also asserts that the evidence used to convict him was circumstantial. He presents two alternative hypotheses of innocence. First, that Taylor was involved in the shooting. Second, that a "short black man in a bluish gray car or another unidentified man" shot White.

"When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *State v. Spencer*, 96-248, p. 15 (La.App. 3 Cir. 11/6/96), 683 So.2d 1326, 1334, *writ denied*, 96-2938 (La. 5/9/97), 693 So.2d 773. "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

12

The State argues that the jury obviously rejected these hypotheses of innocence. In *State v. Jackson*, 14-9, pp. 12-13 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 639, *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066 (fourth alteration in original), this court stated the following regarding a jury's rejection of a defendant's hypothesis of innocence:

> With respect to a jury's rejection of a hypothesis of innocence, our supreme court in [*State v.*] *Calloway*, [07-2306, p. 10 (La. 1/21/09),] 1 So.3d [417,] 422 (citations omitted), concluded:
>
> > [W]e have repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law." Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'"
>
> The jury's decision to reject Defendant's hypothesis regarding the commission of the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict should not be overturned.

The jury in this case apparently chose to find credible Taylor's testimony that he was sleeping when the shots were fired and that he had not seen White that day. We will not overturn the jury's determination on this issue.

It is likewise apparent the jury did not find credible the defendant's hypothesis of innocence regarding the person in the "bluish" car. The jury heard testimony from Andres that either the day before or the day of the shooting, she and the defendant had gotten a ride from Eunice to Opelousas from someone she

13

did not know or remember. She admitted that she had no reason to believe her statements made to investigators after the death of White that she rode with a "short" "light skinned" man with a "miniature fro" who drove a "bluish colored car[]" were incorrect. Tanika testified that she was driving a "tanish [sic] gold" colored car on the night of January 28, 2014, when she left Latwounna's apartment right before the shooting. Sergeant LeBlanc testified it was her conclusion that the car described in the BOLO was likely the car driven by Tanika that night, but admitted there was a possibility the car from the BOLO was still out there.

We find that the jury's rejection of the defendant's hypotheses of innocence is based upon its rational credibility and evidentiary determinations. Therefore, we find no merit in this assignment of error.

## OTHER CRIMES EVIDENCE

The defendant next argues that the trial court erred when it reversed its finding that the State untimely provided the other crimes evidence in this case. The other crimes evidence relates to the discovery that the gun used to shoot White was the same gun the defendant fired in Suire's aunt's house six days before White's murder. The defendant argues that the State's untimely notice prejudiced the defendant.

The State argues that the defendant is only challenging the timeliness of the notice of its intent to offer the other crimes evidence and not the admissibility of that evidence. The State contends that the defendant merely asserts that the other crimes evidence was prejudicial but does not illustrate how he was prejudiced. Alternatively, the State argues that even if the evidence was untimely, the trial court's admission of the evidence is harmless error as there was "ample evidence" presented at trial to convict the defendant which extended beyond his firing of the gun that was used to shoot White six days before White's death.

14

Louisiana Code of Evidence Article 404(B) requires that "the prosecution in a criminal case shall provide reasonable notice in advance of trial," when it intends to offer evidence of other crimes.

From our review of the record in this case, it appears that the defendant and the State were both provided with the Louisiana State Police Crime Laboratory's firearm's analysis for the St. Landry Parish evidence completed on February 6, 2014, which linked the gun used to shoot White with the gun the defendant fired on January 22, 2014, in Lafayette Parish. The State argues that it was not aware of the connection and filed its 404(B) motion as soon as it learned of it. However, the State learned of the connection on April 7, 2016, six days after the trial court's April 1, 2016 hearing deadline for 404(B) motions. On April 1, 2016, the trial court set a *Prieur* hearing for April 8, 2016. It was at this *Prieur* hearing that the trial court ruled that the State did not provide reasonable notice for the other crimes evidence related to the gun. On April 27, 2016, after the hearing was continued from April 13, 2016, the trial court reversed its previous ruling and found that any problems with reasonable notice had now been cured because the "defendant has now been given time to prepare" and ruled that the other crimes evidence was admissible.

The supreme court has held that a "district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *State v. Taylor*, 16-1124, 16-1183, p. 18 (La. 12/1/16), ___ So.3d ___. Furthermore, the supreme court in *State v. Blank*, 04-204, p. 40 (La. 4/11/07), 955 So.2d 90, 123-24, *cert. denied*, 552 U.S. 994, 128 S.Ct. 494 (2007) (footnote omitted), stated the following regarding the effect of late notice on other crimes evidence:

15

[E]ven assuming that the state's notice of its intent to introduce the other crimes evidence was not filed in a timely manner, not every violation of pre-trial procedures, including *Prieur* violations, requires reversal. Before a defendant can complain of such a violation, he must show prejudice. *State v. Sanders*, 93-0001, p. 14 (La.11/30/94), 648 So.2d 1272, 1284 (*citing State v. Hooks*, 421 So.2d 880 (La.1982)); *State v. Strickland*, 398 So.2d 1062 (La.1981). *Prieur* speaks of the "substantial risk of grave prejudice" to a defendant arising out of inadmissible or surprise admission of other crimes evidence, but does not presume that prejudice. [*State v.*] *Prieur*, [277 So.2d 126], 128 [(La.1973)].

Considering all of this, we find that the trial court's decision to admit the other crimes evidence was not an abuse of discretion. The defendant failed to allege with any specificity how he was prejudiced by this late notice or what about his trial strategy was changed because of the admission of the other crimes evidence.

Finally, out of an abundance of caution, we note *State v. Garcia*, 09-1578, p. 55 (La. 11/16/12), 108 So.3d 1, 39, *cert. denied*, ___ U.S. ___, 133 S.Ct. 2863 (2013), where the supreme court stated the following with respect to the applicability of harmless error to the erroneous admission of other crimes evidence:

Finally, the erroneous admission of other crimes evidence has long been held subject to harmless error review. La.Code Crim. Proc. art. 921; *State v. Johnson*, 94-1379, pp. 14-15 (La.11/27/95), 664 So.2d 94, 100-01 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict "surely unattributable" to error)(quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).

We find that even if the trial court erroneously admitted the other crimes evidence, considering the other evidence admitted at trial the error was harmless. For these reasons, this assignment of error lacks merit.

## DECISION

For the foregoing reasons, we affirm Nathaniel McCoy, Jr.'s conviction and sentence.

**AFFIRMED.**