|,MARION F. EDWARDS, Judge.
Defendant Tremaine Payne appeals his conviction for aggravated burglary and armed robbery, violations of LSA-R.S. 14:60 and 14:64, respectively. We affirm.
The Jefferson Parish District Attorney filed a bill of information charging Payne, along with Percy Barrow, with aggravated burglary and armed robbery. Payne pleaded not guilty at his arraignment and on October 24-25, 2000, he was tried separately before a 12-person jury which found him guilty as charged on both counts.
Before sentencing on November 21, 2000, the trial judge denied the defendant’s motion for new trial, and defendant waived delays. Payne was then sentenced to 15 years at hard labor for aggravated burglary (count one) and 30 years at hard labor for armed robbery (count two), without benefit of probation, parole, or suspension of sentence, with the sentences to be served concurrently. J^Payne filed a timely motion for appeal, which the trial judge granted.
The State subsequently filed a multiple offender bill of information alleging Payne to be a second felony offender. After a hearing, the trial judge vacated the original sentence on count two and imposed an enhanced sentence of 50 years at hard labor without benefit of probation, parole or suspension of sentence. Payne re-urged his motion for appeal.
The following facts were developed at trial. At approximately 10:30 p.m. on April 5, 2000, three black men wearing masks forced their way into the home of Virgilio and Angelina Merced in Terry-town, Jefferson Parish. Mr. Merced testified that he and his wife were watching the news on television when the door bell rang. As Mr. Merced began opening the door, which was secured with the chain, the intruders broke through the chain lock and flung the door against the wall so hard that it made a hole in the wall behind the door. Two of the men pointed guns at Mr. Merced, demanded money and also demanded to know how many people were in the house. By that time, Mrs. Merced entered the room to see one of the men hit Mr. Merced in the face with a pistol. Mr. Merced fell to the floor, bleeding profusely from his nose. Mr. Merced surrendered his wallet containing approximately $200.00 in cash.
Mrs. Merced testified that she was praying and begging the men not to do them any harm. As she did so, one of the men told her to shut up, punched her in the face, and stomped on her hand with his foot. The men ordered the Merceds to the living room rug and bound the Merceds with duct tape. Both the Merceds testified that one of the men stood guard over them with a shotgun while the other two ransacked the house.
Michael Merced, their 20-year-old son, was sleeping in his bedroom and |4was awakened by his mother’s screaming. *770 When he peeked out of his bedroom door, he saw a black man walking into his parents’ room across the hall. Michael testified that he grabbed his school bag, which contained some marijuana, and fled to a neighbor’s house to call the police. Because they were masked, none of the Merceds could identify the perpetrators.
Deputies Kron and Serena of the Jefferson Parish Sheriffs Office responded to the call. Deputy Kron testified that when he arrived at the residence, he heard what sounded like glass breaking, and saw a black male with plaits in his hair run from the residence and jump the fence. Deputy Kron radioed headquarters to relay that at least one suspect was heading toward West Kingsway. The two officers began searching the backyard for suspects, and saw a 9-mm handgun lying in the grass. The officers went inside of the home to check on the victims and to look for the perpetrators. They saw Mr. and Mrs. Merced sitting on the living room floor with their hands bound with duct tape. After freeing the victims, Deputy Kron went outside to secure the area around the handgun, while Deputy Serena remained in the house.
Deputies Kron and Serena testified that there was so much blood on Mr. Merced that they feared Mr. Merced had been shot or stabbed. Deputy Serena observed that the living room was “covered with blood,” the house had been thoroughly ransacked, the telephone had been ripped from the wall, and the door of Michael Merced’s bedroom had been forced open.
Shortly thereafter, a canine officer and a dog arrived. The dog located Percy Barrow hiding on the side of the house. Nearby, officers located a duffle bag containing Michael Merced’s checkbook and his Dreamcast video game system that had been in Michael’s room. Officers also found a sawed-off shotgun | Knear Barrow. When Barrow was searched, officers recovered Michael Merced’s camera and cell phone that were taken from his room. Officers also found Michael’s school bag that he had dropped while running away. This bag contained marijuana and prescription pills. At trial, Michael Merced admitted that the marijuana belonged to him, and that he had pled guilty to possessing the marijuana. While Deputy Serena was still at the scene, Payne was returned to the scene after a Street Crimes Officer apprehended him near a canal not too far from the Merced residence. (This officer did not testify at the trial.) Payne was then taken to the Jefferson Parish Sheriffs Office where he signed a waiver of rights form in the presence of Detective Craig Gardner.
Detective Gardner testified that Payne signed the form at 12:55 a.m. and made a voluntary statement that lasted until 1:20 a.m. This statement was recorded and transcribed. In the statement, Payne said that he, “Percy” and “Steve” had gone to the residence because the “dude was up in there handling some business, the Chinese boy.” Payne said that when the “Chinese man open the door we kicked in the door.” He admitted that he ordered the victims to get on the ground, but said Percy and Steve had hit the victims. Payne further admitted that he held a shotgun on the victims while “Percy and Steve went in the back ... to get what they could get.” Payne said he alerted the other two when he saw the police. At that time, he broke out the back window, jumped the fence, and hid behind a house on the next street. Payne then stated that he then made his way toward the canal so that he could “duck off in Trianon” across the canal. When he reached the canal, he saw two officers approaching who ordered him to lie on the ground and placed him under arrest.
*771 Detective Gardner testified that Payne gave another statement, which | ^started at 1:20 a.m. and lasted until 2:00 a.m. At that time, Detective Gardner again advised Payne of his rights, wrote down the questions and Payne’s answers and Payne signed the first page of that statement. This statement indicates Payne admitted he was armed, that he hit the victims, and that Percy said the son “may have a lot of dope and money in the house.” He also stated that he did not take anything from the house, nor did he tape up the victims.
At trial, Payne acknowledged his signatures, but denied making a statement to anyone. He denied participating in the robbery and said he was not acquainted with co-defendant Percy Barrow. He stated that he was in Terrytown, in Trianon Square, which is near the canal bank, when this crime was committed. He testified that the police walked up to him and accused him of burglarizing the house, and further, that the police told him that they had “caught [his] partner,” who was going to “rat” on him. Payne stated that although he had signed the first page of the four-page hand-written document, that pages two through four were not included with page one when he signed it. Further, Payne told the jury that it was not his voice on the tape-recorded statement.
On appeal, Payne asserts that the evidence was insufficient to support the convictions. By this assignment, Payne contends that the evidence was insufficient to prove he was a perpetrator in these offenses. The State contends that it proved beyond a reasonable doubt that Payne was guilty of aggravated burglary and armed robbery.
When evaluating the sufficiency of the evidence, the reviewing court must determine, after viewing the direct and circumstantial evidence in the light most favorable to the prosecution, whether- any rational trier of fact could have found |7the essential elements of the crime beyond a reasonable doubt.[1]
According to LSA-R.S. 15:438, “[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” This -requirement does not establish - a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.[2] When the key issue in a case is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification.[3]
It is undisputed that none of the victims were able to identify the perpetrators, except to say they were black males wearing black clothing and hoods of some sort covering their faces. The crux of Payne’s alleged error is that the State did not negate any reasonable probability of mis-identification. He points out there is no physical evidence to link him to the^erimes, and that no one identified him as a perpetrator. Payne asserts that the only evi *772 dence of his involvement was the inculpa-tory statements, which he claims he did not make.
The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the “fact finder’s discretion only to the extent [^necessary to guarantee the fundamental due process of law.”[4]
In this case, the jury heard the taped statement, which Detective Gardner testified that Payne made after voluntarily waiving his constitutional rights. The jury also heard Payne deny that the voice on the tape belonged to him. In finding Payne guilty, the jury obviously believed that the voice on the tape belonged to him and that he did make the inculpatory statement. Other evidence in the record supports this determination.
We note that Payne’s statements indicate he knew that the name of the one of the perpetrators was Percy, he knew that the victims’ son had drugs in the house, and he knew that the perpetrators forced their way into the home when Mr. Merced opened the door. Further, Payne stated that they were looking for the “Chinese boy.” For our purposes, we consider that Deputy Serena observed that the victims were “Asian.” Additional details in the statement match Deputy Kron’s observations when he first arrived on the scene. In the statement Payne admitted he jumped over the fence after breaking through, the back window. Deputy Kron said he heard what appeared to be glass breaking and then saw a black male with braids in his hair jump over the fence. Two photographs of Payne taken that night were introduced at trial. Payne admitted that he was wearing black, and the photographs clearly depict the braids in his hair.
Finally, Payne contends that the State failed to exclude the reasonable possibility that he was standing by the canal that night when the police mistook him for the perpetrator, merely because he was wearing braids and black clothing. However, Payne presented this hypothesis to the jury through his trial testimony, and in finding him guilty, this theory was clearly rejected. The | Louisiana Supreme Court has recognized that when a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.[5] We find that the jury’s verdict reflected a reasonable construction of the events of the evening based upon the evidence viewed in the light most favorable to the prosecution. The defendant’s inculpatory statement, together with the independent evidence, clearly rules out any theory of misidentifi-cation, and we do not find any other hypothesis that raises a reasonable doubt as to defendant’s guilt.
This assignment of error is without merit.
Finally, we have reviewed the record for errors patent[6] and found none. For the foregoing reasons, the conviction is affirmed.
AFFIRMED.

.Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722; State v. Jackson, 99-1256 (La.App. 5 Cir.7/25/00), 767 So.2d 848, 855.

. State v. Jones, 98-842 (La.App. 5 Cir. 2/10/99), 729 So.2d 57, 63.

. State v. Neal, 00-0674 (La.6/29/01); 796 So.2d 649; State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1054.

. State v. Neal, supra, quoting State v. Mussall, 523 So.2d 1305, 1310 (La.1988).

. State v. Marston, 2000-0589 (La.3/16/2001), 780 So.2d 1058, 1062.

. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Wetland, 556 So.2d 175 (La.App. 5 Cir.1990).