TERRI F. LOVE, Judge.
 

 | ,The State filed a bill of information charging the defendant, Kyle Brown, with aggravated assault of a peace officer with a firearm. The defendant subsequently entered a plea of not guilty and filed motions for a new trial, for judgment of acquittal and for a suspended sentence. The defendant appeals, arguing that the evidence adduced at trial was insufficient to support his conviction for aggravated assault of a peace officer with a firearm. We find that the State satisfied its burden of proving the elements of the crime beyond a reasonable doubt and the evidence was sufficient to support the conviction. We affirm the defendant’s conviction.
 

 FACTUAL AND PROCEDURAL HISTORY
 

 In March 2008, the defendant, Kyle Brown, was charged by bill of information with aggravated assault of a peace officer with a firearm, a violation of La. R.S. 14:37.2. The defendant was arraigned and entered a plea of not guilty. The district court denied the defendant’s motion to quash the bill of information. Following a bench trial, the defendant was found guilty as charged. Defense counsel filed motions
 
 *847
 
 for a new trial, for judgment of acquittal, and for a suspended sentence. The district court denied the motions for a new trial and for |ajudgment of acquittal and granted the motion for a suspended sentence. The defendant was sentenced to serve three years at hard labor; the sentence was suspended and the defendant was placed on three years inactive probation with the condition that the defendant must speak three times per year to youth groups on the effects of alcohol and carrying weapons. The court ordered that the defendant receive credit for time served; that the sentence is to run concurrently with any other sentence; and that the defendant pay a fine of $5,000.00. This appeal followed.
 

 TESTIMONY ADDUCED AT TRIAL
 

 Alexandra Biggs, a friend of the defendant, testified that she accompanied the defendant and another female friend to the French Quarter on the night of January 26, 2008 and into the early morning hours of January 27, 2008. The trio went to several bars during the course of the evening and consumed alcoholic beverages. Ms. Biggs consumed two beers and a mixed drink called a hand grenade. The defendant consumed three hand grenades and more than four beers during the evening. Ms. Biggs testified that the defendant was intoxicated.
 

 As they walked back to their car, they heard a motorcycle backfire. The defendant chased the motorcycle, and Ms. Biggs and the other female friend intervened and pushed the defendant away from the motorcycle and towards their vehicle. Ms. Biggs testified that several white males in a red truck began to provoke the defendant by driving around the parking lot several times, chasing the defendant. She further testified that the men in the red truck were laughing and verbally provoking the defendant as well. Ms. Biggs believed that the defendant retrieved the gun to go after the truck, and the men in the truck did not display a weapon.
 

 |aMs. Derika Gibson, a deputy sheriff at the time of the incident, was sitting in a vehicle parked near the entrance of the Central Parking lot in the vicinity of the Jax Brewery shopping center at 4:00 a.m. on January 27, 2008, when she observed the defendant crossing the street. Ms. Gibson testified to the following:
 

 As a vehicle approached the defendant, he turned around and began to exchange words with the driver telling him to watch “where the f — ” he was going. The defendant approached another vehicle and began to argue with the driver of that car, yelling racial expletives and telling the driver “I’ll f— you up.” Two unknown females, who were with the defendant, were trying to pull him along, telling the motorist not to worry about what he said because he was drunk. The defendant backed away from the females and walked back and forth, continuing to yell at the motorist. The females finally got the defendant to back away, and they walked down the street toward the parking lot. Ms. Gibson then noticed a truck circling inside the lot with the defendant running behind the truck. The defendant was pulling on the tailgate, jumping on the truck, kicking the truck and yelling at the occupants of the truck. It appeared to Ms. Gibson that the driver of the truck was attempting to exit the lot but continued to circle inside the lot in an attempt to get away from the defendant.
 

 The testimony of Orleans Parish Criminal Sheriff Deputies Taraunce Martin and Walter Wilson reflects that on the date of the incident, Deputy Wilson was working a voluntary, paid private security detail at the Central Parking lot in the 100 block of Conti Street. The deputies were responsi
 
 *848
 
 ble for patrolling both the parking lot where the shooting occurred and the lot located across the street. The deputies’ duties were to provide security for the cashier, stop any disturbances that occurred and patrol the lot for possible auto thefts and burglaries.
 

 |4Shortly before the shooting, at approximately 4:00 a.m., the cashier and several customers informed Deputy Martin that a man was running around the parking lot with a gun, screaming and shouting. The defendant was reportedly belligerent, hostile, and appeared to have been drinking. Deputy Martin informed Deputy Wilson of the complaints and asked Deputy Wilson to provide assistance for back-up.
 

 On the night of the shooting, Deputy Martin was wearing his Criminal Sheriffs uniform with his badge displayed on his jacket. Deputy Martin observed a red truck occupied by two males who appeared to be Latino. The driver of the red truck was driving from right to left. As he proceeded around the parking lot he observed the defendant, naked from the waist up, walking back and forth, screaming and fussing. Deputy Martin walked toward the defendant, and Deputy Wilson followed in his vehicle.
 

 Ms. Biggs testified that the deputy did not identify himself as a deputy, and she believed he was a bystander. She testified that the deputy was wearing green pants, a light colored shirt and a brown coat. While the deputy was wearing a hip-length jacket, Ms. Biggs did not see any identification on the outside of the deputy’s coat. Deputy Martin testified that he did not verbally identify himself as a deputy sheriff, however, he testified that his badge was displayed on the outside of his uniform jacket.
 

 The men in the red truck continued to circle the parking lot, but Ms. Biggs was not sure whether the men in the red truck were attempting to leave the parking lot. Ms. Biggs testified that a deputy approached the defendant and escorted him back to their vehicle. However, Ms. Gibson testified that she did not see the deputy escort the defendant to his vehicle. Ms. Biggs testified that the defendant | ..¡retrieved a gun from under the driver’s seat of the vehicle and held it close to his side near his waist.
 

 When he initially approached the defendant, Deputy Martin testified that he did not observe a weapon. Deputy Wilson was approximately five feet from Deputy Martin and the defendant, and he testified that he observed the defendant approaching, holding a gun.
 

 Upon approaching the defendant, Deputy Wilson exited his vehicle with his gun in his hand and turned to cover the car containing the defendant’s companions. Both deputies approached the defendant, who was yelling that he was going “to kill a n-, kill a n-.” Deputy Martin testified that he asked the defendant, “Hey, man, what’s going on? Calm down.” The defendant responded, “F— that s — , I’m about to kill the mother f-, I’m going to kill 'em.” Deputy Martin, repeated, “Hey, man, calm down. Relax.” The defendant responded, “F— that s — , I’m going to kill me a n-I’m going to Ml 'em.”
 

 Deputy Martin testified that his objective was to calm the defendant down and get him off the property because he could see that the defendant had been drinking. Deputy Martin continued to order the defendant to calm down and told him to leave the parking lot or he would have to arrest him. The defendant continued to resist Deputy Martin’s attempts to calm him down and responded, “You don’t Mow who you f with. You not going to do me anything [sic].” Also, the trial testimony re-
 
 *849
 
 fleets that the defendant threatened Deputy Martin, telling him, “You don’t want to “F — ” with me, I’m going to kill an-."
 

 Deputy Martin directed Deputy Wilson to cover the vehicle containing the defendant’s friends, and when Wilson approached the car, the defendant already | ,;had the gun in his hand. Deputy Wilson did not fire upon the occupants of the car because he did not observe evidence that they had a weapon.
 

 Deputy Martin identified himself as a deputy sheriff and repeatedly ordered the defendant to drop his weapon while standing behind a parked truck as a shield. The defendant began to walk to the vehicle, toward his companions, when he suddenly turned and pulled the black, semiautomatic gun from his waistband, pointing it downward, toward the parking lot. Ms. Gibson also testified that she saw the defendant begin to walk away and suddenly turn around, reaching into his waistband and pointing a gun at the deputy. When the defendant pulled the gun from his waistband, Deputy Martin took cover behind a parked vehicle. Deputy Martin drew his weapon and ordered the defendant to “Drop the weapon. Drop the weapon now.” Deputy Martin testified that he repeated his order to drop the weapon several times more in a more forceful tone. The defendant turned, raised the gun towards Deputy Martin and yelled, ‘Well, f— it, I’ll kill you.” Deputy Martin fired several shots at the defendant. The defendant again responded, “F— that s — . I’m going to get ‘em. I’m going to kill ‘em. I’m going to kill the mother f-.”
 

 Ms. Gibson testified that while she could hear the deputy and the defendant exchanging words, she was unable to distinguish what was said. Further, Ms. Biggs testified that she could not hear what the conversation was between the deputy and the defendant.
 

 The testimony adduced at trial conflicts with regard to Deputy Martin’s identification of himself as an officer and the number of shots fired before the defendant fell to the ground. The testimony also conflicts with regard to whether the defendant fired the gun prior to Deputy Martin firing his weapon. Deputy |7Wilson testified that he was certain that the defendant fired the first shot and Deputy Martin returned fire. Deputy Martin testified that he fired the first shot, followed by four or five additional shots, before the defendant fell to the ground.
 

 Ms. Biggs testified that something startled the defendant, he turned, and was shot by the deputy. She further testified that the defendant pointed his gun at the deputy, however she testified that she did not hear the defendant use any racial epithets or threaten to kill anyone. Also, Ms. Gibson testified that she observed the deputy fired several shots at the defendant, who fell to the ground. Deputy Martin denied shooting the defendant after he fell to the ground.
 

 Ms. Biggs then observed who she believed was a security guard approach the scene; she did not hear anyone identify themselves as the police or order the defendant to drop his weapon. Deputy Martin testified that he kicked the defendant’s gun from away from him and called for an ambulance. Deputy Wilson contacted the New Orleans Police Department and Sheriffs department supervisors and informed them of the shooting.
 

 Ms. Gibson did not observe another deputy on the scene until after the shooting. Ms. Gibson called 911 and reported the incident. Deputy Martin also testified that he called 911 and requested an ambulance. Deputy Martin testified that he knew Dep
 
 *850
 
 uty Derika Gibson and recognized her as she walked into the parking lot after the shooting.
 

 Sergeant Randy Mannix, a staff sergeant with the United States Army 177(h Armor Brigade, testified to the following:
 

 Sgt. Mannix met the defendant five years prior to the incident, when the brigade mobilized for deployment in Iraq. The defendant was one of his soldiers.
 

 |sSgt. Mannix supervised the defendant’s gun safety training, which entailed the manner in which a weapon is held, properly loaded, and carried. Sgt. Mannix testified that no alcohol use is allowed when handling a weapon, and all military personnel are trained in what does and does not mix with alcohol use. He testified that the defendant would have been trained and advised not to use or handle a weapon if he had consumed alcohol. Sgt. Mannix further testified the defendant was fired upon while deployed in Iraq and fatally fired upon others. He was aware that the defendant had been diagnosed with post-traumatic stress disorder upon his return from Iraq. Sgt. Mannix referred the defendant for counseling with the Veterans Center in Biloxi, Mississippi.
 

 ERRORS PATENT
 

 A review of the record
 
 for errors
 
 patent reveals that the defendant was sentenced on March 2, 2009, the same date that his motion for a new trial and motion for judgment of acquittal were denied, without a waiver of the delay required by La. C. Cr. P. art. 873. However, in
 
 State v. Collins,
 
 584 So.2d 356 (La.App. 4 Cir.1991), this court held that the failure to observe the delay would be deemed harmless error where the defendant did not challenge his sentence on appeal. Therefore, because the defendant in this case raises no error relative to his sentence, the failure of the trial court to observe the delay is harmless error.
 

 STANDARD OF REVIEW
 

 When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact |nthat all of the elements of the crime had been proved beyond a reasonable doubt.”
 
 State v. Neal,
 
 2000-0674 (La.6/29/01), 796 So.2d 649, 657 (citing
 
 State v. Captville,
 
 448 So.2d 676, 678 (La.1984).
 

 SUFFICIENCY OF EVIDENCE
 

 The defendant asserts that the evidence was insufficient to support his conviction because the State failed to prove every element of the crime of aggravated assault upon a peace officer. Specifically, the defendant argues that the State failed to prove that Deputy Martin was acting in the course and scope of his duties as a peace officer when he encountered the defendant in the parking lot. In support of his argument, the defendant relies on the principles of tort and contractual liability and cites cases where an off-duty police officer working a private paid detail were either tortfeasors in negligence cases or were parties whose benefits were at issue for purposes of indemnity.
 
 [1]
 

 
 *851
 
 Assault is defined as “an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery.” La. R.S. 14:36. Aggravated assault is defined as “an assault committed with a dangerous weapon.” La. R.S. 14:37(A). Aggravated assault upon a peace officer with a firearm is defined as “an assault committed upon a peace officer who is acting in the course and scope of his duties with a firearm.” La. R.S. 14:37.2(A). La. R.S. 40:2402 defines a peace officer to include a deputy sheriff.
 

 | ipThe State has the burden of proving the following: 1) that the victim was a peace officer; 2) that the defendant was aimed with a firearm; 3) that the defendant committed an assault with a firearm upon the peace officer; and, 4) that the peace officer was acting in the course and scope of his duties.
 

 In
 
 State v. Berry,
 
 391 So.2d 406, 412 (La.1980), a Jefferson Parish deputy sheriff, while working a paid security detail at a Metairie bank, was fatally shot during the perpetration of an armed robbery. The defendant assigned as error that, as a matter of law, the victim was not a peace officer engaged in his lawful duties at the time of the shooting and that it was error for the trial court to deny his request for a special jury charge on that issue. In upholding the trial court’s denial for the special jury charge, the Supreme Court stated:
 

 The victim was a Jefferson Parish Sheriffs Deputy wearing his regular Deputy Sheriffs uniform and on guard duty, a security detail, at the bank during normal banking hours at the time of the offense. He, just as other deputy sheriffs often do, had volunteered for this detail, drawing extra pay from the bank. It might be said that he was “moonlighting.” He was killed by defendant because he was an armed deputy whose presence was a threat to defendant’s bank robbery mission, and his death came during an effort to prevent defendant’s successful commission of a serious felony.
 

 Whatever the nature of the deputy’s general activities at the bank in the context of the question of whether he was engaged in his lawful duties-it was surely within the scope of his lawful duties as a deputy sheriff for him to try to prevent an armed robbery in his presence.
 

 Therefore, we conclude that the trial judge did not err in refusing defendant’s request to charge the jury that the victim was not a peace officer engaged in his lawful duties.
 

 In
 
 State v. Wilkerson,
 
 367 So.2d 319 (La.1979), an off-duty deputy sheriff conducted a warrantless search of the defendant’s belongings at the request of the apartment manager. The deputy worked as a security guard at the apartment |! complex, where the apartment manager was told by the defendant’s roommate that the defendant had stolen items from the manager’s brother. The Court found that the deputy sheriff was acting in his capaci
 
 *852
 
 ty as a law enforcement officer at the time he conducted the search and stated that a Louisiana deputy sheriff never truly goes off duty but remains at all times a member of the law enforcement agency, charged with greater knowledge and responsibility in criminal affairs.
 

 In
 
 State v. Muse,
 
 548 So.2d 21 (La.App. 5 Cir.1989), in upholding the defendant’s conviction, the court found that the officer was in his official police uniform and was attempting to keep peace and order in and ai’ound the lounge. The fact that he was receiving extra pay from the lounge owner was of no consequence.
 
 Id.
 

 Under this line of reasoning, we find that the State established their burden of proof that Deputy Martin was acting within the scope of his lawful duties as a deputy sheriff when the instant incident transpired. The testimony adduced at trial established that Deputy Martin was an Orleans Parish Criminal Deputy Sheriff when he shot the defendant. Deputy Martin approached the defendant to investigate complaints made at the parking lot.
 

 Although he was receiving extra pay for working a paid private detail at the parking lot, Deputy Martin remained “a member of the law enforcement agency, charged with greater knowledge and responsibility in criminal affairs” when he came upon the defendant, who was conducting himself in a belligerent manner while carrying a gun. The record reflects that the defendant was armed with a gun, verbally threatened Deputy Martin,' and pointed the gun at him.
 

 Further, Deputy Martin’s confrontation of the defendant came as a result of Deputy Martin’s attempt to intervene and prevent the defendant from committing a 112serious felony upon the customers and employees of Central Parking. Additionally, like
 
 Muse,
 
 the record reflects that Deputy Martin was wearing his full deputy uniform with his badge clearly displayed on the front of jacket when he approached the defendant.
 

 We further find the officers’ testimony was sufficient to prove that the defendant committed aggravated assault upon the police officers as required by La. R.S. 14:37.2. In
 
 State v. Payne,
 
 00-2129 (La.App. 4 Cir. 7/25/01), 794 So.2d 79, writ denied, 01-3342 (La.11/1/02), 828 So.2d 570, this Court affirmed the defendant’s aggravated assault convictions. We noted that two police officers testified that the defendant pulled a gun and attempted to fire upon them.
 
 Payne,
 
 00-2129 at p. 6, 794 So.2d at 83. One of the officers testified that he was pursuing the defendant in his police vehicle when the defendant stopped, turned around, pulled out a gun from his waistband, and aimed at him.
 
 Id.
 
 This officer ducked for protection, which caused him to crash into a church.
 
 Id.
 
 Then, the defendant pointed the weapon at another officer.
 
 Id.
 
 The other officer testified that he was scared when the defendant aimed the weapon at him.
 
 Id.
 
 We found the officers’ testimony sufficient to prove that the defendant committed aggravated assaults upon the police officers as required by law.
 
 Id.
 

 The facts of the present case are similar to the facts in
 
 Payne.
 
 The deputies’ testimony reflects that customers reported to the cashier that the defendant was belligerent, hostile, and appeared to have been drinking, and he was running around the parking lot with a gun. Deputy Martin approached the defendant, and the defendant pulled a gun from his waistband. Deputy Martin took cover behind a parked vehicle and Deputy Wilson provided backup. The testimony of the |isdeputies as well as that of an observing, off-duty deputy reflects that the defendant pointed the gun at Deputy Martin.
 

 Deputy Martin testified that after making repeated attempts to calm him, the
 
 *853
 
 defendant continued to resist his efforts. The defendant grew increasingly belligerent, yelling expletives and racial slurs. Deputy Martin ordered the defendant to drop his weapon and he refused. Deputy Martin then fired shots at the defendant. The 911 supervisor authenticated the tape of the 911 call received in connection with the incident, in which a code 108, “officer needs assistance,” request was made.
 

 We conclude that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime were proved beyond a reasonable doubt. Applying the
 
 Jackson v. Virginia
 
 standard, this Court cannot second guess the rational credibility determinations of the fact finder at trial.
 
 State v. Vincent,
 
 07-239, p. 8 (La.App. 5 Cir. 12/27/07), 978 So.2d 967, 973. We therefore find the evidence sufficient to support the defendant’s conviction.
 

 DECREE
 

 Accordingly, the defendant’s conviction is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The factors employed by Louisiana courts to determine whether an employee's negligent conduct falls within the "course and scope" of his employment duties are: (1) the payment of wages by the employer, (2) the employer’s power of control, (3) the employee’s duty to perform the particular act, (4) the time, place and purpose of the act in relation
 
 *851
 
 to service of the employer, (5) the relationship between the employee's act and the employer's business, (6) the benefits received by the employer from the act, (7) the motivation of the employee for performing the act, and (8) the reasonable expectation of the employer that the employee would perform the act.
 
 Baumeister v. Plunkett,
 
 95-2270, p. 3 (La.5/21/96), 673 So.2d 994, 996,
 
 Orgeron on Behalf of Orgeron
 
 v.
 
 McDonald,
 
 93-1353, p. 4 (La.7/5/94), 639 So.2d 224, 226,
 
 LeBrane v. Lewis, 292
 
 So.2d 216, 218 (La.1974). See also,
 
 Wright v. Skate Country, Inc.,
 
 98-0217, (La.App. 4 Cir. 5/12/99), 734 So.2d 874,
 
 Duryea v. Handy,
 
 96-1018 (La.App. 4 Cir. 10/3/97), 700 So.2d 1123, and
 
 Luccia v. Cummings,
 
 94-416 (La.App. 5 Cir. 11/16/94), 646 So.2d 1142.