MARION F. EDWARDS, Chief Judge.
12Pefendant/appelIant, Jamal L. Lewis (“Lewis”), appeals his conviction and sentence on a charge of manslaughter in violation of La. R.S. 14:31. For reasons that follow, we affirm.
Lewis was charged with manslaughter by a bill of information. He was arraigned and entered a plea of not guilty. Several defense motions, including motions to suppress the confession and identification, were considered by the trial court and subsequently denied. On October 20, 21, and 22, 2009, Lewis was tried before a twelve-person jury that unanimously found him guilty as charged.
Lewis’ post-trial motions for new trial and for post-verdict judgment of acquittal were denied by the trial court on October 29, 2009. On that same date, Lewis waived sentencing delays, and the trial judge sentenced him to imprisonment at hard labor for forty years without benefit of probation or ^suspension of sentence. Lewis filed a motion to reconsider sentence that was denied and a timely motion for appeal that was granted.[1]

FACTS

On April 6, 2006, Deputy Michael Poletti of the Jefferson Parish Sheriffs Office (JPSO) was dispatched to 1500 Westwood Drive in Marrero in reference to an aggravated battery. Upon arrival, he observed a black male juvenile, later identified as fifteen-year-old Martell Callahan (“Callahan”), lying on his stomach on a sidewalk adjacent to the parking lot of the Concor-dia Apartments at Westwood Drive and Lapalco Boulevard. Callahan appeared to be unconscious, and his breathing was very shallow.
Deputy Poletti asked the crowd standing around if anybody saw what happened. Shortly thereafter, an anonymous black male juvenile told officers that a black male wearing a black T-shirt and tan pants committed the crime. Deputy Po- *81 letti then directed other deputies to secure the scene and disperse the crowd. As he was doing so, he was approached by a black male wearing a black T-shirt and tan pants, later identified as Lewis, defendant/appellant herein, who said, “We was just playing. Is he okay?” Deputy Polet-ti immediately placed Lewis in handcuffs and advised him of his rights.
Lewis stated that he and Callahan were “play fighting,” and he accidentally stabbed Callahan with a folding knife, which he threw into a wooded area across the street. Deputy Poletti and Lewis, along with other deputies, proceeded to that location and looked for the knife, but they were unable to locate it. Lewis stated that he and Callahan were not having an argument, nor were they mad at each other at the time of the incident.
l4JPSO Detective Roger Gorumba testified that Lewis had a slight abrasion to his right hand on the knuckle area, which Lewis said was from a fight that occurred before he stabbed Callahan. The detective also testified that Lewis had blood on his pants, which Lewis explained came from the knife he used to stab Callahan. Detective Gorumba took a statement from Lewis, age seventeen, which was played for the jury.[2]
Detective Gorumba also took a statement from eyewitness Brian Johnson (“Johnson”), age thirteen. At trial, Johnson testified that, two or three days before the homicide, he was walking home through the Concordia Apartments on his way home from band practice. As Johnson was walking, he tried to call his mother on his cell phone to ask her to come and pick him up because it was raining. Lewis, whom Johnson did not know, approached Johnson and asked him if he could use Johnson’s cell phone. Johnson gave the cell phone to Lewis, but Lewis did not use it. When Johnson asked Lewis to return his cell phone, Lewis just walked away with it. Because of his smaller size, Johnson was afraid to confront Lewis. Johnson went home without the cell phone, but he did not tell his mother that his cell phone was gone because he was afraid of punishment.
According to Johnson’s testimony, on the day of the homicide, Callahan went to Johnson’s house, and they decided to go to Nicholson Playground to play basketball. At approximately 3:00 to 4:00 p.m., Callahan and Johnson got on a bicycle to go to the playground. Callahan was pedaling the bicycle, and Johnson rode on the handlebars. Because there was a lot of traffic on Westwood Drive, they turned into the parking lot of the Concordia Apartments.
|sAs they were riding through the apartment complex parking lot, Johnson saw Lewis sitting down close to the apartments. Johnson testified that he politely asked Lewis to return the cell phone, but Lewis did not respond. Instead, Lewis got up and began “fussing” in a loud tone. Lewis walked up to them, pushed Johnson off the bicycle, and began talking about fighting. Johnson told Lewis he was not going to fight him because he (Johnson) was small, and Lewis was big and strong.
At this point Callahan, who was about the same height as Lewis, stepped in and tried to protect Johnson. Johnson saw Lewis walk back to his patio, and he *82 thought Lewis was going to get the cell phone. Lewis knelt down, picked something up, and walked back to the parking lot.
When Lewis walked back toward them, Callahan walked toward Lewis with his hands up in a boxing pose preparing to fight. Lewis had his left hand behind his back holding his right hand. At some point, Johnson saw that Lewis had a knife in his hand, and Johnson called out to warn Callahan. At that point, Lewis stabbed Callahan and ran away. Callahan ran approximately twenty or thirty feet and then collapsed.
Johnson went over to Callahan, who told Johnson to take his (Callahan’s) cell phone out of his pocket and call his parents. Johnson called Callahan’s parents and then 911. Right after the incident, Lewis’ mother walked toward them. When Johnson told her that Lewis had stabbed his friend, she started crying. Johnson waited for the ambulance, which took Callahan away. Four days later, Johnson talked to the police, and he positively identified Lewis as the perpetrator.
Dr. Karen Ross, who performed the autopsy on Callahan, testified that the cause of death was a stab wound to the abdomen. She explained that the stab wound went through the cartilage, liver, pancreas, splenic vein, and the two major Rblood vessels in the body, the aorta and the vena cava. Dr. Ross stated that the stab wound went at least four and one-half inches deep into the body and was one inch long, and that it went all the way through Callahan’s body to his spine.
After the State rested its case, Lewis testified that he met Johnson sometime in 2006, and he recognized Callahan, but they were not friends. Lewis then recounted an incident that led to the confrontation that ended in the stabbing. Lewis testified that before the day of the homicide, Johnson and “Greg” came around in Greg’s sister’s car. Greg was driving, and Johnson was in the passenger seat. Lewis and his friend, “Alonzo,” were standing outside. Greg and Johnson exited the car, and they were clowning around. Greg and Johnson subsequently drove off, and Lewis and Alonzo threw iced tea on their car. Greg, his sister, and Johnson came back again. Greg’s sister told Lewis she wanted him to wash her car, but Lewis refused; however, Lewis gave Greg’s sister five dollars the next day to get the car washed. Lewis testified that Greg and Johnson were “fussing” because they could not get the matter handled their way.
On the day of Callahan’s homicide, at approximately 3:00 p.m., Lewis was walking home from work. Thirty minutes later, as he was walking through the Concor-dia Apartments, Greg and Alonzo exited a car, and another “dude” was driving. Greg ran at Lewis, and they fought for a minute. After the fight, Lewis went inside his residence at Apartment 13C and talked to his girlfriend on the phone. While Lewis was talking, he was playing with his butterfly knife, which he described as “cool” and “fancy.”
About an hour after the fight with Greg, Lewis heard a knock on the door, and his sister said Alonzo was at the door for him. When Lewis looked out the window, he saw Alonzo walking off. Lewis hurried downstairs while he was |7talking on the phone, and he put the knife in his pocket. Lewis went outside and saw Johnson and Callahan in front of Alonzo’s apartment at 13A.
Callahan said to Lewis, “You had a fight with my friend.” When Lewis asked Callahan the identity of his friend, Callahan said, “Greg.” Johnson had a gray metal pole in his hand, and Johnson and Callahan were standing next to each other. *83 Lewis testified that he did not go inside because he did not want to turn his back on Johnson and Callahan. Lewis was frightened because Callahan was talking about “smashing” him, which meant Callahan was going to beat him up or kill him.
Lewis then pulled out the knife that was in his pocket to scare Johnson and Callahan, and he tossed the phone to Alonzo. Lewis told Johnson and Callahan to get away from him, and he did not want any problems with them. Callahan walked up to Lewis, who backed up. Callahan then charged Lewis and swung. Lewis swung at Callahan with the knife and hit him once, but he did not intend to hit him. Afterward, Lewis retrieved his phone from Alonzo, and he called 911 while going inside his (Lewis’) apartment.
After Lewis called 911, he went back outside. Lewis stated that, after the incident, he was scared. So, he removed the knife from his pocket, walked down the street, threw it in the woods, and went back inside. Then, Lewis went outside again, walked up to the police, and asked them if Callahan was alright. The police said Lewis fit the description of the suspect, so Lewis put his hands behind his back. Lewis told Detective Gorumba that he was just playing, he did not mean to do it, and he was only trying to scare Callahan. Lewis denied telling Deputy Poletti that he and Callahan were not arguing and not mad at each other.
Lewis testified that he had two prior convictions: one for an aggravated battery committed two days prior to the Callahan homicide and one for having | scontraband in a correctional facility. He pled guilty to both offenses on June 13, 2007, and received two concurrent one-year sentences.
On appeal, Lewis assigns two errors for our review. In the first, he asserts the evidence presented by the State was insufficient to support his conviction for manslaughter. In the second, Lewis maintains his sentence is excessive.

SUFFICIENCY OF EVIDENCE

Lewis argues that the evidence was insufficient to support a manslaughter conviction when only the elements of negligent homicide were proven beyond a reasonable doubt. Lewis admits he stabbed Callahan. However, he asserts the evidence presented at trial only proves the elements of negligent homicide, not manslaughter. Lewis argues that the evidence shows the stabbing was accidental, not intentional. Lewis further contends that Johnson’s trial testimony was inconsistent with his statement and with his testimony at the suppression hearing. The State responds that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of manslaughter beyond a reasonable doubt.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.[3]
In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every *84 reasonable hypothesis of innocence.”[4] The | nreviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.[5]
In the matter before us, Lewis was convicted of manslaughter, which is defined by La. R.S. 14:31 as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
The jury was instructed on both the specific intent manslaughter and felony/misdemeanor manslaughter theories. Further, the jury was instructed that, in order to find Lewis guilty under the second theory, it had to find that Lewis killed Callahan, and Lewis was engaged in the perpetration or attempted perpetration of aggravated battery, simple battery, or aggravated assault at the time of the killing.
1mA battery is the intentional use of force or violence upon the person of another.[6] A simple battery is a battery committed without the consent of the victim.[7] Simple battery is a general intent offense.[8] An aggravated battery is a battery committed with a dangerous weapon.[9] Aggravated battery also requires proof of general intent.[10] General criminal intent is present when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.[11] General intent may be proved by evidence that the defendant did the acts which have been declared criminal.[12] The fact that a de *85 fendant does not specifically intend the greater degree of harm to the victim does not prevent the jury from taking into account the reasonably foreseeable consequences, which aggravate the seriousness of the battery offense, in assessing the defendant’s culpability.[13]
An assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery.[14] An aggravated assault is an assault committed with a dangerous weapon.[15] An aggravated assault conviction requires proof of only general criminal intent.[16]
Lewis does not dispute that he stabbed and killed the victim; rather, he argues that the stabbing was an accident, and he had no intent to kill the victim. As such, he contends that he should have been convicted of negligent homicide, which [ uis the killing of a human being by criminal negligence.[17] Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.[18] The jury was instructed that negligent homicide was a responsive verdict to the charge of manslaughter.
In the matter before this Court, the jury was presented with two versions of how the fight that led to Lewis stabbing Callahan occurred. The jury was also properly instructed on the different theories of manslaughter and on the elements of negligent homicide.
The jury was presented with conflicting testimony, including some inconsistencies, but obviously found the State’s witnesses more credible than Lewis. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal.[19]
Given the testimony of the State’s witness regarding the circumstances surrounding the stabbing, and the additional testimony from Dr. Ross relating to the severity of the fatal wound, the jury could have found the elements of manslaughter beyond a reasonable doubt. We find no merit in this assignment.

EXCESSIVE SENTENCE

Lewis asserts his maximum forty-year sentence is unconstitutionally excessive because he is an adolescent who did not intend to kill or inflict great bodily harm upon the victim. Lewis points out that he was only seventeen when h2the incident occurred, and it was the result of a fight between two teenage boys. Lewis also points to his 911 call to get help for the victim, his concern for the victim, his readiness to give police a statement, and his remorse and regret as proof that he is not the worst of offenders.
 The Eighth Amendment to the United States Constitution and Article I, *86 § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness.[20] A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.[21] A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.[22]
In the instant case, Lewis was convicted of manslaughter. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years.[23] Lewis received the maximum forty-year sentence. Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender.[24]
A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate.[25] The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.[26] In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the 11snature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts.[27]
After hearing from the family and friends of both Lewis and Callahan, the trial judge found that, although Lewis alleged self-defense, claiming for the first time at trial that the thirteen-year-old had a pipe, that allegation was not reflected in any of Lewis’ prior statements and was entirely incredible. She also found that Lewis was the clear aggressor in the situation, and he could have retreated from the encounter at any time, but chose not to. Instead, the trial judge noted that Lewis chose to inflict grave bodily harm upon Callahan resulting in death.
The trial judge said she took into account the fact that Lewis called 911 shortly after the stabbing and reported that somebody got stabbed. She also took into account that, two days before this stabbing, Lewis broke a bottle over the head of a mentally challenged boy in the same parking lot. The trial judge stated that she listened carefully to the testimony of the families of Lewis and Callahan and felt their pain. However, she concluded that, under the circumstances, it was her considered judgment that it was appropriate to sentence Lewis to the maximum forty-year sentence.
We have considered Lewis’ arguments in this assignment and are confronted with the following facts: Lewis thrust the knife into Callahan’s abdomen with such force that it went through several organs and two major arteries to his spine. Although *87 Lewis claimed it was an accident, Dr. Ross testified that it was extremely unlikely that this was an accidental injury because of the depth of the wound. As the trial judge reasonably found, Lewis was the clear aggressor in this situation, and he could have retreated from it at any time, but he chose not to. Also, the fifteen-year-old victim was killed because he came to the aid of Johnson, a |14thirteen-year-old boy who was younger and smaller than Lewis, whom Lewis was threatening to fight. Additionally, Callahan’s mother and father testified that the loss of their son had caused them great pain and that their lives would never be the same.
We also note, as did the trial judge, that Lewis had a criminal history, including a crime of violence. Also, this is not Lewis’ first adult offense. He pled guilty to aggravated battery in June of 2007, as a result of an incident where he broke a bottle over the head of a mentally challenged person two days before the death of the victim in the instant case. Lewis also pled guilty on that same date to bringing contraband into a prison facility. Further, Lewis was involved in a separate fight one hour prior to the incident in the instant case.
Given the facts of this case, the applicable law, and the trial judge’s reasons for sentencing, we find no abuse of the trial court’s vast sentencing discretion.

ERRORS PATENT

We have reviewed the record before us for errors patent on the face and find that, while the transcript reflects that the trial judge sentenced Lewis to imprisonment at hard labor for forty years without benefit of probation or suspension of sentence, the commitment shows that the trial judge sentenced Lewis to imprisonment at hard labor for forty years without benefit of parole, probation, or suspension of sentence. The transcript prevails.[28] We hereby order the trial court to correct the commitment to accurately reflect the sentence imposed by the trial judge.[29] It is further ordered that the Clerk of Court for the Twenty-Fourth 11BJudicial District transmit the corrected commitment to the officer in charge of the institution to which Lewis has been sentenced.
We also note that there is a conflict between the transcript and the commitment regarding the information given to Lewis regarding the prescriptive period for applying for post-conviction relief. Although the commitment correctly states that Lewis has two years from the date his conviction and sentence becomes final in which to apply for post-conviction relief, the prevailing transcript shows that the trial judge incorrectly states the prescriptive period runs “from today’s date to seek post-conviction relief.” We hereby advise Lewis that he has two years from the date his conviction and sentence becomes final to apply for such relief.[30]
For the foregoing reasons, we affirm Lewis’ conviction and sentence, and we inform him of the proper prescriptive period for applying for post-conviction relief as set forth in this opinion. We further remand the matter to the trial court with orders to correct the commitment and to *88 transmit the corrected commitment to the proper institution.

AFFIRMED; REMANDED WITH ORDER.

. Lewis also filed an application for post-conviction relief seeking an out-of-time appeal that the trial judge dismissed as moot due to his pending appeal.

. Lewis’ statement and trial testimony were very similar. Additionally, in his statement, Lewis explained that the victim ran up to him swinging while Lewis was swinging the butterfly knife, and the knife stabbed the victim in the side. Lewis admitted in his statement that the victim did not have anything in his hands, and the victim's hands were balled up into fists. Lewis also said in his statement that, prior to the fight, either the victim or his friend knocked on Lewis’ door.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

. La. R.S. 15:438.

. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.

. La. R.S. 14:33.

. La. R.S. 14:35.

. State v. Lee, 01-2082 (La.App. 4 Cir. 8/21/02), 826 So.2d 616, 623, writ denied, 02-2549 (La.9/5/03), 852 So.2d 1019.

. La. R.S. 14:34.

. State v. Edwards, 06-643 (La.App. 5 Cir. 3/27/07), 957 So.2d 185, 190, writ denied, 08-1988 (La.8/29/08), 989 So.2d 110.

. La. R.S. 14:10(2).

. Id.

. Id.

. La. R.S. 14:36.

. La. R.S. 14:37.

. State v. Hill, 35,013 (La.App. 2 Cir. 9/26/01), 796 So.2d 127, 131.

. La. R.S. 14:32.

. La. R.S. 14:12.

. State v. Macon, 06-0481 (La.6/1/07), 957 So.2d 1280, 1285-86; State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1, 4.

. Id.

. State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622.

. La. R.S. 14:31(B).

. State v. Pearson, 07-332 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656.

. State v. Dorsey, 07-67 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130.

. State v. Pearson, 975 So.2d at 656.

. Id.

. State v. Lynch, 441 So.2d 732, 734 (La.1983).

. La. R.S. 14:31 provides that a person convicted of manslaughter "shall be imprisoned at hard labor for not more than forty years.” There is no prohibition against parole, probation or suspension of sentence. However, La.C.Cr.P. art. 893 provides that persons convicted of violent offenses listed in La. R.S. 14:2(B)(4) (manslaughter) are to be denied the benefit of probation and suspension of sentence.

.See, La.C.Cr.P. art. 930.8.