MARC E. JOHNSON, Judge.
^Defendant, Robbreion Green, appeals his conviction for second degree murder on the basis of insufficient evidence. For the reasons that follow, we affirm Defendant’s conviction and sentence.
Defendant was indicted by a grand jury on May 5, 2011 and charged with the second degree murder of Rodney Ross in violation of La. R.S. 14:8o.!.[1] He proceeded to trial on October 2, 2012. After a four-day trial, a 12-person jury found Defendant guilty as charged. The trial court subsequently sentenced Defendant to life imprisonment without the benefit of parole, probation or suspension of sentence.

FACTS

Shortly after midnight on April 11, 2010, the Jefferson Parish Sheriffs Office (JPSO) received two 911 calls regarding multiple shots being fired in the 1000 block of Dimarco Street in Marrero. Sergeant Eddie Klein with the JPSO |sresponded to the calls. When he arrived, he observed the murder victim, Rodney Ross (also known as “Mob”), lying on the ground along with ten .45 caliber casings and two 9 mm casings. An autopsy revealed the victim sustained two gunshot wounds to the head and eleven gunshot wounds to the rest of his body. The autopsy also showed that two separate guns were used to shoot the victim.
During the investigation, Sgt. Klein learned that a maroon GMC or Chevy pickup truck was seen leaving the scene. Surveillance cameras from nearby businesses captured the pickup truck but not the license plate or any occupants. Sgt. Klein also discovered that a similar maroon pickup truck was involved in a nonfatal shooting with .45 caliber casings that occurred six days earlier on April 5, 2010. He viewed still photographs from surveillance video of that incident, which he subsequently showed to Defendant’s mother, who thought the person in the photograph was “Telly.” After a computer search, an arrest warrant was issued for Telly Wes-terman on April 12, 2010 for attempted murder in connection with the April 5th shooting. Westerman came into the Detective Bureau later that night, waived his rights and gave five statements, three of which related to the April 10th homicide.
In his first statement dated April 13, 2010 at 2:28 a.m., Westerman stated that on the day of the murder, he, Maurice *1174 Williams, Defendant, co-defendant Jeffery Davis, and Ross gathered around 5:00-6:00 p.m. at Williams’ mother’s apartment at 1000 Dimarco. Westerman explained that he left the apartment around 10:00-11:00 p.m. and went to his girlfriend’s house. He later received a phone call from Ross, who angrily accused him of taking his gun. Westerman told Ross that he did not have his gun. Ross called five to seven more times and, although no one said anything on the phone each of those times, Wester-man could hear the group talking about a gun. Westerman then decided to go back to the |4apartment to see what was going on. When he arrived, Williams, Davis, Defendant and Ross were there, and the victim was upset that someone had taken his gun.
Westerman reminded Ross that when he left, Ross was playing with his small black and gray gun and Defendant’s gray and black 9 mm gun on the floor. At that point, Westerman and Williams decided to go to Tim’s Billiards to play pool, which was located around the corner from the apartment. Defendant and Davis jumped into the truck with them, but Ross stayed behind. Before arriving at Tim’s Billiards, Defendant asked Westerman to bring him back to the apartment so he could get “something.”
Westerman complied and went back to the apartment. When they arrived, everyone got out of the truck except Wester-man. While Westerman was waiting, he saw Williams in his rearview mirror coming down the alley. Williams opened the door of the truck and was about to enter it when Westerman heard two shots. Wes-terman turned around and saw Davis shooting Ross and Ross falling to the side. Defendant subsequently returned to the truck and said he had shot Ross in the head with the last two shots.
According to his statement, Westerman and Williams left the scene in Westerman’s truck, but later encountered Defendant and Davis walking down the street and let them get into the truck. They then went to Tim’s Billiards. After learning there were no pool tables available, the group walked back to the truck so Westerman could get his pool stick. Westerman told Defendant and Davis to get their guns out of his track and hide them, which they did.[2] Afterward, they went back inside Tim’s Billiards and then left.
Westerman stated he dropped everyone off on Carmadelle in front of Davis’ house, after which Westerman called his girlfriend and went to her house. IsWesterman told his girlfriend what had happened.[3] Approximately one hour later, Williams called Westerman and told him “they” were looking for a maroon truck. Westerman later spoke to Davis, who told him that he had talked to the police and that the police wanted to question him as well.
In his statement, Westerman confirmed he had positively identified Defendant in a photographic lineup. He further stated that he knew Davis had gone back and retrieved his gun, but was unsure whether Defendant had done so because he had not talked to Defendant since the shooting. *1175 Westerman gave a second statement at 3:17 a.m., in which he confirmed that he had viewed photographic lineups and had positively identified Williams. He gave a third statement at 4:56 a.m., in which he stated that Defendant and Davis did not walk away from the scene after they shot Ross like he claimed in his first statement, but that they got into his truck immediately after the incident.[4]
After Westerman gave his statements, Sgt. Klein obtained video surveillance from Tim’s Billiards, which he said confirmed Westerman’s account of what happened. Sgt. Klein further testified that Wester-man’s statements were consistent with the physical evidence. He stated ballistics tests showed that a .45 caliber gun and a 9 mm gun were used to kill Ross. The .45 caliber gun used in the murder was recovered and was determined to be the same gun Davis used in the April 5, 2010 nonfatal shooting.
In July 2010, Sgt. Klein learned that Williams’ mother, Eunice Williams, had information about Ross’ murder. She subsequently came to the Detective |fiBureau and gave a statement. In her statement, which was played for the jury, Ms. Williams said that she arrived home at approximately 10:00 p.m. on the night in question and found Ross, her cousin, alone playing video games. She asked where her son, Westerman, Davis and Defendant were, and Ross replied that they had gone to the pool hall. She asked Ross why they had left him there, but Ross would not say. Ms. Williams stated that she could tell something was wrong.
Ross asked Ms. Williams for Wester-man’s phone number. He then called Westerman and Ms. Williams overheard Ross say, “man stop playing.” Ross also called Defendant and said the same thing. Shortly thereafter, her son, Westerman, Davis and Defendant came to her house. Defendant came inside and took a Xanax pill, while the others stayed outside the front door. After that, Defendant and Ross left and Ms. Williams closed the door behind them. About one minute after she closed the door, she heard approximately nine gunshots. She waited awhile and opened the door to find police on the scene and Ross lying on the ground. Ms. Williams stated she positively identified her son, Westerman, Davis, Defendant, and Ross from photographic lineups.[5]
At trial, Westerman was the State’s primary witness. Westerman’s trial testimony was similar to the statements he made to the police; however, he additionally testified at trial that the day after Ross’ murder, Williams showed him Ross’ 9 mm gun and said, “I told that b*tch I got him.” Westerman also testified that a month pri- or to Ross’ murder, he and Williams were riding up the street when they saw Ross. *1176 Williams told Westerman to stop and he did. Williams and Ross pushed each other, and Williams yelled to Ross, “I’m going to kill you b*tch.” |7Westerman explained that Williams was upset because Ross had “hollered” at the mother of his child; however, Ross said it was Defendant who had done so.
Westerman explained that he omitted this information when giving his statements to the police because he wanted to protect Williams, who was his close friend. He stated he disclosed the additional information approximately one year after Ross’ murder. Westerman testified that he was initially charged with second degree murder in the instant case and aggravated second degree battery in the April 5, 2010 non-fatal shooting. The aggravated second degree battery charge was later changed to three counts of attempted murder. In exchange for his trial testimony in the present case, Westerman pled guilty to reduced charges of accessory after the fact. Westerman explained that he faced zero to five years for each charge or possibly probation.

DISCUSSION

In his sole assignment of error, Defendant claims the evidence was insufficient to support a conviction for second degree murder. He claims the record is devoid of any credible evidence that he and Davis killed Ross. Defendant asserts that Wes-termaris testimony was too inconsistent and self-serving to be believable.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La.6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
|sIn cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04); 866 So.2d 973, 977.
Defendant was convicted of second degree murder in violation of La. R.S. 14:30.1. Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). In addition to proving the statutory elements of the charged offense at trial, the State is required to prove Defendant’s identity as the perpetrator. See State v. Draughn, 05-1825 (La.1/17/07); 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Ingram, 04-551 (La.App. 5 Cir. 10/26/04); 888 So.2d 923, 926. When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentifieation in order to carry its burden of proof. State v. Suggs, 11-64 (La.App. 5 Cir. 12/13/11); 81 So.3d 815, 821, writ denied, 12-54 (La.4/20/12); 85 So.3d 1269. Positive identification by one *1177 witness is sufficient to support a conviction. Id.
In the instant case, Westerman testified that he sat in his truck while Williams, Davis, and Defendant went to Ms. Williams’ house. While Westerman was waiting, he saw Williams in his rearview mirror coming down the alley. Williams opened the door of the truck and was about to enter it when Westerman Rheard two shots. Westerman turned around and saw Davis shooting Ross. Afterward, Defendant came up to the truck and said he had shot Ross twice in the head.
The victim sustained IB gunshot wounds. Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person. State v. Hoffman, 98-3118 (La.4/11/00); 768 So.2d 542, 585, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07); 958 So.2d 24, 27. Specific intent to kill may also be inferred from the extent and severity of the victim’s injuries. State v. Stacker, 02-768 (La.App. 5 Cir. 12/30/02); 836 So.2d 601, 606, writ denied, 03-411 (La.10/10/03); 855 So.2d 327.
On appeal, Defendant points out numerous inconsistencies in Westerman’s statements. However, the jury heard those inconsistencies and Westerman’s explanations for those inconsistencies during direct and cross-examination. For example, Westerman said in his first statement that Davis and Defendant walked away after they shot Ross; however, in his third statement, he stated that they got into his truck right afterward. Westerman said he lied in his first statement because he was initially trying to minimize his involvement in the incident. Also, in his first statement, Westerman stated that he and the others got together about 5:00 or 6:00 p.m.; however, at trial Westerman testified that he and Williams were at Ms. Williams’ house and that Defendant, Davis, and Ross came later around 9:00 or 10:00 p.m. Westerman explained that he was nervous and “moving fast” at the Detective Bureau when he gave those times, and that the times were approximate. Also, Sgt. Klein testified that Westerman was “guessing” on the times and Sgt. Klein found Westerman’s statements to be consistent with the physical evidence.
| ¶ Nevertheless, the most significant part of Westerman’s testimony, i.e., that he witnessed Davis shoot the victim and heard Defendant admit he shot the victim, never changed. Also, Angel Merrill, Wester-man’s former girlfriend, testified that Wes-terman told her shortly after the shooting that he witnessed a man shoot the victim, and that the other man shot the victim in the face and head.
Defendant further points out that Westerman got a favorable plea bargain in exchange for his testimony. However, the jury also heard the details of that plea agreement and Westerman’s hope for probation. Nevertheless, the jury accepted Westerman’s testimony and found him to be credible. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97); 694 So.2d 1052, 1056.
Despite the inconsistencies in Wester-man’s statements and the fact Westerman received a favorable plea bargain in exchange for his testimony, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support the verdict and that the State negated any reasonable probability of misidentification. (See State v. Weary, 03-3067 (La.4/24/06); 931 So.2d *1178 297, 312, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006), where the supreme court found the evidence sufficient to support a first degree murder conviction despite the inconsistencies in the witnesses’ testimonies; and State v. Neal, 00-674 (La.6/29/01); 796 So.2d 649, 658-59, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002), where the supreme court found the evidence sufficient to support a first degree murder conviction even though the co-perpetrator turned State’s witness and testified pursuant to a favorable plea agreement.)

J^ERRORS PATENT

Pursuant to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990), we reviewed the record for errors patent and found no errors.

DECREE

For the foregoing reasons, we find the evidence was sufficient to support the jury’s verdict that Defendant committed second degree murder. Thus, Defendant’s conviction and sentence for second degree murder are affirmed.

AFFIRMED

. The indictment also charged co-defendant, Jeffery Davis, with second degree murder. Davis was convicted and filed a separate appeal, which bears docket number 13-KA-237.

. At trial, Westerman testified that he went to Tim's Billiards so the surveillance cameras would show Defendant and Davis hiding their guns.

. At trial, Westerman's girlfriend testified that Westerman told her that he saw one of the men shoot the victim first, and then the other man stood over the victim and shot him in the face and head. She explained that she went to the Detective Bureau with Westerman and gave a recorded statement to the same effect to which she testified.

. Westerman's fourth and fifth statements given at 5:16 a.m. and 5:41 a.m. discussed his involvement in the April 5, 2010 non-fatal shooting. In his fourth statement, Wester-man explained that he went to a gas station and three men were staring at him. Thereafter, he picked up Davis to see if Davis recognized the men. Words were exchanged when Westerman and Davis encountered the men, and Davis shot one of the men in the leg. In his fifth statement, Westerman said he had positively identified Davis in a photographic lineup as the person who was in his truck on April 5th and who had shot at three people.

. At trial, Ms. Williams claimed she did not remember that a murder occurred outside her door or that she had talked to the police about what she saw. She explained that her memory was faulty because she was under the influence of drugs at that time. Ms. Williams reviewed her statement but continued to claim she did not remember giving it. Sgt. Klein testified that Ms. Williams did not appear to be intoxicated or under the influence of drugs when she came to the Detective Bureau and gave her statement.